**No. 26-5236**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ALISHEA SOPHIA KINGDOM, SOLO NICHOLS, and JAS KAPULE,
on behalf of themselves and all persons similarly situated,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**MOTION FOR A STAY PENDING APPEAL**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
CHARLES W. SCARBOROUGH
McKAYE L. NEUMEISTER
DOMENIC A. CANONICO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiffs in district court, and appellees here, are Alishea Sophia Kingdom, Solo Nichols, and Jas Kapule, who are three trans-identifying inmates in the custody of the Federal Bureau of Prisons (BOP). They bring this action on behalf of themselves and a class of other similarly situated inmates. Defendants in district court, and appellants here, are Donald J. Trump, in his official capacity as President of the United States; Todd Blanche, in his official capacity as Acting Attorney General of the United States; William K. Marshall, III, in his official capacity as Director of BOP;[1] Christopher A. Bina, in his official capacity as Assistant Director for the Health Services Division of BOP; Dana R. DiGiacomo, in her official capacity as Assistant Director of the Reentry Services Division of BOP; and Shane Salem, in his official capacity as Assistant Director of the Correctional Programs Division of BOP.

---

[1] This action was originally brought against defendants William Lothrop, in his official capacity as Acting Director of BOP, and Pamela Bondi, in her official capacity as Attorney General. Director Marshall and Acting Attorney General Blanche were automatically substituted as parties under Federal Rule of Civil Procedure 25(d).

i

The States of Indiana, Idaho, Alabama, Arkansas, Florida, Alaska, Georgia, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming, participated as amici curiae before the district court.

Several other inmates who are not named plaintiffs in this case have attempted to intervene or otherwise participate in district court: Carla C. Keys, Jeremy Pinson, Antonio Crawford, David Simpkins, Darrell Nash, Michael R. Dye, Elijah Stone, Willie A. Milton, Michelle Alford, Oscar Contreras Aguilar, Job Gillette, Andy Quinn Goodall, and Marissa Hunt.

There were no additional parties or amici curiae in district court, and none have entered an appearance before this Court.

## B.    Ruling Under Review

The ruling under review is the memorandum opinion and order (Dkts. 215 & 216) granting plaintiffs' motion for a preliminary injunction, issued by the Hon. Royce C. Lamberth in *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.). The opinion and order are attached to this motion.

## C.    Related Cases

An appeal from an earlier preliminary injunction in this case is currently pending before this Court. *See Kingdom v. Trump*, No. 26-5181

(D.C. Cir.). Counsel are aware of three related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Doe v. Blanche*, No. 1:25-cv-286 (D.D.C.); *Jones v. Blanche*, No. 1:25-cv-401 (D.D.C.); and *Moe v. Trump*, No. 1:25-cv-653 (D.D.C.). An appeal from those consolidated cases is currently pending in this Court. *Doe v. Blanche*, No. 26-5238 (D.C. Cir.). This Court previously heard an appeal from those cases, which was decided on April 17, 2026. *See Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026) (vacating preliminary injunctions).

/s/ *Domenic A. Canonico*
Domenic A. Canonico
*Attorney, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ..................................................................................... iv

INTRODUCTION ...............................................................................................1

STATEMENT .....................................................................................................3

    A.    Statutory and Regulatory Background......................................... 3

    B.    This Litigation ............................................................................. 6

ARGUMENT .....................................................................................................9

I.    The Government Is Likely To Prevail On The Merits. ...................... 10

    A.    The district court erred in concluding that the Policy is arbitrary and capricious. .........................................................10

    B.    The preliminary injunction violates the PLRA and is overbroad.................................................................................21

II.    The Remaining Factors Favor A Stay. ............................................. 24

CONCLUSION ............................................................................................... 26

CERTIFICATE OF COMPLIANCE

ATTACHMENT A: District Court PI Order (Dkt. 215)

ATTACHMENT B: District Court PI Opinion (Dkt. 216)

ATTACHMENT C: 2026 Policy (Dkt. 125)

## INTRODUCTION

Defendants respectfully move for a stay pending appeal of the preliminary injunction issued by the district court (Lamberth, J.) on June 17, 2026. The injunction again prohibits the Federal Bureau of Prisons (BOP) from enforcing its 2026 Policy, which implements the President's *Defending Women* Executive Order (EO) concerning medical treatment for inmates with gender dysphoria. Less than two weeks ago, this Court stayed an earlier preliminary injunction prohibiting enforcement of the same policy. *See* Order, *Kingdom v. Trump*, No. 26-5181 (D.C. Cir. June 17, 2026) (per curiam) (June 17 Order). A stay of the latest injunction is warranted for many of the same reasons.

For almost a year and a half, the district court has prevented BOP from taking any action to implement the President's policy choice to stop providing sex-rejecting treatment for inmates in BOP's custody. The court has done so based solely on claims under the Administrative Procedure Act (APA) that the agency actions through which BOP has sought to implement the EO were arbitrary and capricious.

The district court originally enjoined BOP's 2025 memoranda implementing the EO because they purportedly did not contain adequate explanation under the APA. BOP then spent the better part of a year studying

the question, compiling an administrative record of over 3,000 pages and producing approximately 47 pages of explanation for its adoption of the 2026 Policy. Nevertheless, the court once again found BOP's efforts deficient and enjoined the new policy based on little more than its disagreement with BOP over appropriate treatment for gender dysphoria in the prison context. In so doing, the court fundamentally disregarded the President's authority to set policy for the Executive Branch and flouted basic principles of administrative law by considering materials outside the administrative record, requiring the agency to conduct its own empirical studies, and substituting the court's medical and policy judgments for those of the agency. The resulting injunction violates basic principles of APA review and fundamental limitations on injunctive relief under the Prison Litigation Reform Act (PLRA).

Because the district court has once again improperly prevented BOP from implementing important policy choices in an area where the Executive enjoys significant deference, this Court's intervention is again required. Just as the Court granted a stay of the May 26 injunction prohibiting enforcement of BOP's policy, a stay of the June 17 injunction is likewise warranted.

Plaintiffs oppose this motion.[2]

**STATEMENT**

### A.     Statutory and Regulatory Background

**1.**     On January 20, 2025, President Trump issued Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO). As relevant here, the EO requires the Attorney General, to the extent consistent with law, to "ensure that [BOP] revises its policies concerning medical care to be consistent with this order, and … that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.* § 4(c).

**2.**     In February 2025, BOP issued two memoranda implementing the EO. The first, which concerned "social accommodations," prohibited BOP from granting "[r]equests for clothing accommodations," such as "undergarments that do not align with an inmate's biological sex." Dkt. 1-1, at 2-3. The second memorandum provided that "no [BOP] funds are to be expended for any medical procedure, treatment, or drug for the purpose of

---

[2] On June 22, the government moved the district court for a stay pending appeal under Fed. R. App. P. 8(a), Dkt. 222, which the court denied on June 25, Dkt. 228.

conforming an inmate's appearance to that of the opposite sex." Dkt. 1-2, at 2. Under its initial June 3, 2025 preliminary injunction and subsequent renewals of that order, the district court prohibited BOP from implementing those memoranda.

**3.** In February 2026, BOP issued a new policy on medical care for inmates with gender dysphoria, superseding the 2025 memoranda. *See* Add.34-43 (2026 Policy). BOP explained that, "[i]n light of [the EO] and BOP's own independent judgment," it was adopting a "revised" approach to "treatment for gender dysphoria that is more aligned with the latest scientific information," "is tailored to the unique needs of the inmate," and "accounts for the complex security and administration concerns in the correctional environment." Dkt. 186-1, at 5, 7. BOP issued that Policy after extensive reviews of medical studies, correctional policies, and pertinent case law. *Id.* at 5. And BOP produced approximately 47 pages of explanation for the Policy along with an over 3,000-page administrative record. *See id.* at 1-47; Dkt. 151 (index).

Under its new Policy, BOP will develop individualized treatment plans for each inmate diagnosed with gender dysphoria, "tailored to the specific clinical needs of the inmate." Add.39. Such plans would include, as appropriate, "psychotherapy, group counseling, psychiatric services, and

psychotropic medications." Dkt. 186-1, at 8; *see* Add.39-40. The Policy provides that BOP will not provide "sex trait modification surgeries" or "social accommodations" to address gender dysphoria. Add.40-41. Nor will BOP provide hormones as treatment for gender dysphoria to inmates who are not already receiving them. Add.40. For inmates who are currently receiving hormones, BOP will place them on individualized "tapering plan[s]" after "consider[ing] the appropriate factors." Add.40. The Policy also recognizes that for certain inmates "it may not be appropriate ... for the initial tapering plan to include cessation of hormones." Add.41.

In formulating the Policy, BOP determined that organizations it had previously relied upon for guidance on gender dysphoria were of dubious credibility. Dkt. 186-1, at 5-7. Regarding hormones in particular, BOP concluded that "recent research" had "raised significant concerns on the safety, efficacy, and prudence of hormonal interventions to address gender dysphoria." *Id.* at 26. BOP also considered the effects of hormones, social accommodations, and sex-trait modification interventions on prison administration and security and concluded that it was more appropriate in the correctional context to adopt the alternative treatments identified in the Policy. *Id.* at 10-13, 18-20, 28-30.

### B. This Litigation

**1.** The named plaintiffs are three inmates who have been diagnosed with gender dysphoria and have received hormones and social accommodations while in BOP custody. Dkt. 67, at 3-6. They sued in March 2025 challenging the EO and the 2025 memoranda, and moved for a preliminary injunction based on Eighth Amendment and APA claims. Dkts. 1, 7, 7-1.

On June 3, 2025, the district court certified a class of all inmates in BOP custody diagnosed with gender dysphoria and issued a class-wide preliminary injunction based solely on plaintiffs' APA arbitrary-and-capricious claim. Dkts. 67, 68. The court stayed the 2025 memoranda under 5 U.S.C. § 705 and enjoined BOP from enforcing the EO or the memoranda as to hormones and social accommodations. Dkt. 68, at 2. The government did not appeal that injunction, instead undertaking the extensive review process that culminated in the 2026 Policy.

Pursuant to the PLRA, the preliminary injunction expired after 90 days. 18 U.S.C. § 3626(a)(2). Relying on the analysis in its original order, the district court repeatedly issued new injunctions for additional 90-day periods. *See* Dkts. 79, 96, 114.

6

**2.** On April 1, 2026, the government moved to dissolve the preliminary injunction then in effect given the promulgation of the Policy. Dkt. 160, at 11. In late April, plaintiffs filed a supplemental complaint and sought a new preliminary injunction, relying on their Eighth Amendment and revised APA claims challenging the Policy. Dkt. 179-1, at 33, 42; Dkt. 182.

While briefing on plaintiffs' motion for a new injunction was ongoing, plaintiffs filed an additional motion requesting that the court extend the existing injunction to "maintain the status quo" if their new motion was not resolved before the existing injunction expired on May 31. Dkt. 188, at 1. The government opposed. Dkt. 192, at 5.

On May 26, the district court granted plaintiffs' request to extend the then-existing injunction. Dkt. 202. The court stated that "[a]lthough there are new factual circumstances in this case," none upset its "prior holding" that a preliminary injunction was warranted. *Id.* at 2.

**3.** On May 29, the government asked this Court to stay the district court's extended preliminary injunction pending appeal.

On June 17, this Court stayed the May 26 injunction, explaining that it was effectively "an administrative injunction" lacking "any 'discernible legal basis.'" June 17 Order 2-3. And the Court recognized that the government

7

was irreparably harmed "by an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Id.* at 3 (quotation marks omitted).

**4.** Less than three hours after this Court granted the stay, the district court issued a new preliminary injunction prohibiting enforcement of the 2026 Policy. Add.3-33. In approximately seven pages of merits analysis (Add.19-27), the court concluded that plaintiffs were likely to succeed in showing that the Policy is arbitrary and capricious under the APA for three reasons: (1) the Policy was "reverse engineered … to implement [the] EO," Add.25; (2) the Policy's bottom line is "objectively unreasonable given the evidence before the agency," Add.23 (italics omitted); and (3) BOP had not adequately considered its experience under its prior policy, Add.20-23.

The court further concluded that plaintiffs were likely to suffer irreparable harm in the absence of preliminary relief, crediting testimony that removing hormones and social accommodations would worsen plaintiffs' gender dysphoria and rejecting BOP's explanation that the Policy provided for appropriate treatments. *See* Add.27-31. Despite acknowledging that "not every class member requires the same treatment for their gender dysphoria," Add.27, the court determined that "class members are injured by

virtue of their gender dysphoria diagnosis alone, making individualized findings unnecessary," Add.31. And the court concluded that the equities favored plaintiffs because "'the only deleterious public effect'" of the injunction was the cost of providing plaintiffs' preferred treatments. Add.31-32.

The court stayed the Policy under 5 U.S.C. § 705, enjoined BOP "from enforcing" the Policy, and ordered BOP to "continue providing" sex-rejecting interventions to class members "in accordance with BOP policy and practice" prior to the EO. Add.1. The court also included a boilerplate recitation that the injunction complied with the PLRA's requirements. Add.2.

## ARGUMENT

In considering a stay pending appeal, this Court considers the likelihood of success on the merits, the movant's irreparable injury, the balance of harms, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009). As this Court previously found in staying a prior preliminary injunction prohibiting enforcement of this same policy, these factors strongly support a stay here.

## I. The Government Is Likely To Prevail On The Merits.

### A. The district court erred in concluding that the Policy is arbitrary and capricious.

The district court wrongly concluded that plaintiffs were likely to succeed on the merits of their APA claim. Arbitrary-and-capricious review is narrow and deferential, and a reviewing court may not "'substitute its judgment for that of the agency.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009). The court's role is simply to determine whether the agency "has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And when an agency changes its policies, it need only demonstrate "awareness that it *is* changing position" and that "there are good reasons for the new policy." *Fox*, 556 U.S. at 515. BOP amply satisfied those requirements.

**1.** In adopting the Policy, BOP reasonably considered the relevant issues and explained that, regardless of the EO, it would promulgate the same policy as a matter of its "own independent judgment." Dkt. 186-1, at 5; *see* Add.39. In approximately 47 pages of analysis—based on a more than 3,000-page administrative record—BOP discussed the issues it considered, the evidence it reviewed, and its reasons for changing its policy. *See* Dkt. 151; Dkt. 186-1, at 1-47.

The administrative record shows that BOP conducted extensive reviews of its prior policies, relevant medical studies and expert opinions, state correctional policies, pertinent case law, and prison-administration and security concerns. *See* Dkt. 186-1, at 1-47. Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care. *Id.* at 3. BOP also identified grave "concerns about the body of research and potential research bias" underlying the recommendations of certain organizations on which BOP had previously relied. *Id.* at 4. And BOP noted, among other things, that other countries had "distanced themselves from" that approach, and "leading community organizations" in the United States were "similarly reevaluating their clinical guidance." *Id.*

Ultimately, given the weak evidence for the efficacy of sex-rejecting interventions (Dkt. 186-1, at 4, 9-10, 24-27), the risks attending such interventions (*id.*; Dkt. 160-3, at 32-42), and prison-administration and security concerns (Dkt. 186-1, at 2-3, 10-13, 18-20, 28-30), BOP found it appropriate to adopt a new approach prioritizing psychotherapy. *See also* Dkt. 186-1, at 13–16, 21–23, 30–33 (considering costs, reliance interests, and alternatives). That decision was "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423.

**2.** With barely any citation to the extensive administrative record or discussion of BOP's explanation for its actions, the district court again concluded that the agency's policy was arbitrary and capricious. In so doing, the court flouted four elementary administrative-law principles: (1) agencies can follow Presidential directions in policymaking; (2) in evaluating agency decision-making courts must limit their review to evidence in the administrative record; (3) agencies can rely on the information before them without conducting new studies; and (4) most fundamentally, courts may not substitute their own policy judgments for those of the agency. The government is thus likely to succeed on the merits.

**a.** The crux of the district court's merits analysis is that the 2026 Policy is arbitrary and capricious because it was "preordained" and "reverse engineered … to implement" the EO—and thus "pretextual" in "violation of the APA." Add.25. That conclusion violates Supreme Court precedent, defies common sense, misconstrues the record, and disregards the President's authority over Executive Branch policymaking.

As the Supreme Court has explained, courts "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Department of Com. v. New York*, 588 U.S. 752, 781 (2019). "Agency

policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" *Id.* (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).  Any "internal political pressure" or "desire to reach a particular result" does not render the result invalid under the APA where "objective evidence [adequately] support[s] the agency's conclusion."  *Jagers v. Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185-86 (10th Cir. 2014).  Agencies are allowed (and indeed required) to act based on Presidential policy priorities, so long as they ultimately take actions grounded in legitimate rationales that are reasonably supported.

Indeed, it is necessary for the proper functioning of the Executive Branch that agencies follow Presidential policy directions.  The Constitution requires that the President have authority to ensure that agencies act "in accordance with the policies that the people presumably elected the President to promote."  *Collins v. Yellen*, 594 U.S. 220, 252 (2021).  And the President clearly may issue directions to agencies concerning actions within their authority. *See, e.g.*, *Trump v. American Federation of Gov't Emps.*, 145 S. Ct. 2635 (2025) (mem.); *id.* (Sotomayor, J., concurring).  Accordingly, agencies lack discretion to "disregard an Executive Order," and "must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).  It is thus perfectly

proper for political officials to "come into office with policy preferences" and "work with staff attorneys to substantiate the legal basis for a preferred policy," *Department of Com.*, 588 U.S. at 783, provided that the resulting action is reasonable and reasonably explained.

Contrary to the district court's suggestion (Add.25-26), BOP has never asserted that the Policy was issued without regard to the EO. Rather, BOP has consistently acknowledged that the EO is one reason it reconsidered its approach. *See, e.g.*, Dkt. 186-1, at 1, 5; Dkts. 1-1, 1-2. The Policy and administrative record invoke the EO and expressly explain that it "supports this policy." Add.39; *see* Dkt. 186-1, at 1, 5. BOP additionally explained, however, that even absent any Presidential directive on the subject, it still would have adopted the Policy as a matter of "BOP's own independent judgment." Dkt. 186-1, at 5; *see* Add.39. An agency's decision cannot qualify as "pretextual" where the allegedly concealed purpose expressly appears on the face of the action.

In promulgating a new policy to implement the EO consistent with well-established principles, BOP acted reasonably under the APA. The district court's conclusion that the Policy nonetheless violates the APA simply because it "'reach[ed] the same result'" as the EO, Add.26, is irreconcilable with Supreme Court precedent.

**b.** The district court also erred in determining that the "conclusion" reached in the Policy was "'so implausible that it could not be ascribed to … agency expertise.'" Add.23. The court reached that determination—after a paltry two paragraphs of analysis—by relying almost exclusively on materials that were not contained in the administrative record, but were instead filed by plaintiffs in this litigation. *See* Add.24-25 (citing Dkt. 179-2 & 179-4 (plaintiffs' expert declarations); Dkt. 179-5 (testimony of BOP's expert in different case)).

That approach contravenes the most basic principle of judicial review under the APA: that "courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made," *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997). That rule bars consideration of extra-record material presented by a litigant against the government even where those materials "elaborate[] on details already included in the record."[3] *Id*. at 624. The court did not even acknowledge its deviation from this "general rule," much less seek to justify it. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)

---

[3] This scenario is not to be confused with the permissible practice of an agency offering extra-record material that "'illuminate[s]' the reasons that are implicit in the internal materials." *Olivares v. TSA*, 819 F.3d 454, 464 (D.C. Cir. 2016); *see infra* pp. 18-19.

(discussing limited exceptions).  That error alone warrants reversal of the court's implausibility holding.

In any event, the district court disregarded BOP's explanations and evidence and substituted its own policy preferences.  The basis for the court's implausibility holding was its emphasis on "evidence … suggest[ing] that denying" hormones and social accommodations "to patients for whom such care is medically necessary can lead to a deterioration in mental health and increase depression, anxiety, and self-harm."  Add.24.  But BOP addressed that evidence; the agency simply disagreed with it. *Cf. Prometheus*, 592 U.S. at 426.  Relying on its own expert along with other medical research, BOP determined that the evidence supporting such treatments was unreliable and seriously disputed, and that such treatments involved considerable risks. Dkt. 186-1, at 25-26.  BOP accordingly concluded that social accommodations and sex-rejecting surgeries are not medically necessary, *id.* at 9-10, 16-17, and that "hormones are not medically necessary to address gender dysphoria" for inmates who are "not currently receiving hormones," *id.* at 25.  And BOP determined that most if not all inmates already receiving hormones should be carefully tapered off based on individualized plans. *Id.* at 25-27.  It was entirely reasonable for BOP to choose to limit interventions that are medically disputed, may result in irreversible harm, and raise

16

prison-administration and security concerns, and to instead employ lower-risk treatments.

The court nowhere acknowledged these explanations by BOP. Instead, the court took it as indisputable fact that hormones and social accommodations are medically necessary, crediting the opinion of plaintiffs' experts, whom the court deemed more qualified. *See* Add.24; Add.28 (declaring "clear winner" in "battle of the experts"). But the court's opinion about the relative qualifications of the experts provides no basis to conclude that BOP refused to "follow … the evidence in the record." Add.25. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). That is especially true here, since courts are ill-equipped "to meaningfully evaluate … considered policy judgments" regarding "medical and scientific matters where there is serious debate and disagreement." *West Virginia v. B.P.J.*, No. 24-43, slip op. 24-25 (S. Ct. June 30, 2026). BOP acted well within its discretion in crediting the medical views and research that it considered most reliable.

**c.** The district court also erred in concluding that BOP acted arbitrarily and capriciously by failing to "consider" its "own experience

providing" hormones and social accommodations "to inmates diagnosed with gender dysphoria."  Add.20.

**i.**  The record is replete with examples of BOP acknowledging its prior approach to treating gender dysphoria, assessing evidence, and explaining why it was appropriate to change course.  *E.g.*, Dkt. 186-1, at 1, 5, 7, 11-12, 31.  That alone satisfies the deferential arbitrary-and-capricious standard.  Additionally, BOP's Medical Director Dr. Elizabete Stahl filed a declaration explaining that the "senior officials" at BOP who were "responsible for evaluating, implementing, and ultimately formulating the 2026 [P]olicy" also "wrote, consulted and applied the previous BOP policy," and they "used [their] experience with the prior policy to help formulate the 2026 Policy."  Dkt. 186-3, ¶ 17.

The district court refused to credit Dr. Stahl's declaration, however, concluding that because it was filed in litigation and post-dates the 2026 Policy, it constituted an impermissible "[p]ost-hoc rationalization[]."  Add.23.  But the declaration did not seek to "provide new [reasons]" for BOP's decision.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020).  Rather, it confirmed the unsurprising fact that BOP's staff brought their experience under prior policies to bear in formulating the Policy.  The declaration is thus "'merely explanatory of the original record.'"  *Olivares*,

819 F.3d at 464 .  The government did not file the declaration to provide a new justification for its decision, but to rebut plaintiffs' unfounded claim that BOP had ignored that experience.  *See* Dkt. 179-1, at 36-38; Dkt. 186, at 8.

**ii.**    The court assumed that the absence of express discussion of specific instances of past BOP experience in the record meant that BOP "refus[ed] to consider evidence bearing on the issue."  Add.20 (quoting *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).  But the principle that an agency cannot "refuse to evaluate … information" already before it, *Butte County*, 613 F.3d at 195, does not require an agency to seek out or create evidence that it otherwise does not possess.  Under the APA, an agency need not "conduct or commission [its] own empirical or statistical studies," *Prometheus*, 592 U.S. at 427, and may instead draw "reasonable inference[s] based on the data before it," *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 586 (2025).

Thorough medical case studies of inmates, evaluating whether prior gender-dysphoria treatments were "ineffective or harmful," *see* Add.22, is not discrete evidence that BOP already possessed. And reviewing bare treatment notes for hundreds or thousands of inmates from their limited time in custody, in the absence of a real scientific study, would not provide useful information.  Moreover, according to Dr. Stahl, there is serious doubt

that BOP could even produce scientifically acceptable evidence to that effect.

*See* Dkt. 186-3, ¶¶ 13, 16.[4]  Contrary to the district court's view, BOP was not

required to commission any formal studies from its staff, or systematically

review thousands of medical files in the absence of such a study, for officials

to rely on their general experience in shaping the new policy.

**iii.**    More fundamentally, the district court's emphasis on the lack of

evidence in the record that prior treatments were "ineffective or harmful,"

Add.22, betrays a basic misunderstanding of BOP's reasoning.  BOP's policy

is to "deliver medically necessary health care to inmates effectively in

accordance with proven standards of care without compromising public

safety concerns." Dkt. 186-1, at 5 (quoting Program Statement 6010.05).  As

the administrative record shows, BOP revised its views on sex-rejecting

interventions in a carceral setting because it determined that, based on

significant growing disagreement in the medical community and recent

revelations calling into question prior guidance, the risks were unjustified.

*Id.* at 5-7, 24-26.  Neither the court nor plaintiffs have identified any basis to

conclude that the broader medical debates over this issue lack relevance to

---

[4] Indeed, neither BOP nor its expert were aware of reliable high-quality studies supporting sex-rejecting interventions in the carceral setting.  *See* Dkt. 186-1, at 10, 17, 26; Dkt. 160-3, ¶¶ 42, 83, 94, 118 (Dr. Kaliebe Decl.).

incarcerated individuals.  BOP thus acted well within its discretion in relying on generally available medical research to determine what risks are acceptable in the face of medical uncertainty, and the district court was not free to substitute its own views on these complex issues.

## B. The preliminary injunction violates the PLRA and is overbroad.

The government is also likely to succeed in showing that the preliminary injunction violates the PLRA and is overbroad.

**1.** The district court failed to make proper findings that the injunction complies with the PLRA's restrictions on preliminary-injunctive relief.  The PLRA requires that preliminary injunctions with respect to prison conditions "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).  A court must "find[] that" such needs-narrowness-intrusiveness requirements are met before granting "any prospective relief." *Id.* § 3626(a)(1).

Here, however, the district court did not so much as mention the PLRA's relief requirements in its opinion.  *See* Add.3-33.  Rather, it summarily asserted that those requirements were met.  Add.2.  The PLRA requires much more.  *See, e.g.*, *Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278-79 (11th Cir. 2020).

**2.** The court's injunction against the entire Policy also "extend[ed] ... further than necessary." 18 U.S.C. § 3626(a)(2).

Plaintiffs' theory of harm, which the court accepted, is that "[d]enying" class members "hormone therapy and [social] accommodations" specifically will cause irreparable harm. Dkt. 179-1, at 43; *see* Add.31. But the Policy governs more than just hormones and social accommodations. It also directs clinicians to first "identif[y] medical and psychiatric comorbidities," to "prioritize[]" psychotherapy, and to consider the use of "[p]sychotropic medication." Add.39-40. Additionally, it prohibits BOP from providing sex-rejecting "surgeries to address" gender dysphoria. Add.40. Accordingly, even on plaintiffs' theory of injury regarding hormones and social accommodations, it was unnecessary to enjoin the whole Policy to "correct the harm the court f[ound] requires preliminary relief." 18 U.S.C. § 3626(a)(2).[5]

Nevertheless, the district court enjoined BOP from enforcing the Policy in its entirety and ordered BOP to "continue providing" treatments "in accordance with BOP policy and practice" prior to the EO. Add.1. The court's opinion did not even purport to consider whether the scope of its injunction

---

[5] That is especially true because the Policy has an express severability provision. Add.42.

22

was consistent with equitable principles or with the PLRA's need-narrowness-intrusiveness requirements.  Thus, the injunction is overbroad and violates the PLRA.  For similar reasons, it was improper to stay the entire Policy under 5 U.S.C. § 705.  *See Make the Rd. NY v. Noem*, No. 25-5320, 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025).

**3.** The preliminary injunction is also overbroad because the district court's conclusion that the class as a whole faced irreparable harm is unfounded.  *See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("mass preliminary injunction[s]" disallowed without "a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed").  The certified class consists of all BOP inmates diagnosed with gender dysphoria.  *See* Dkt. 67, at 27.  Plaintiffs and their expert concede, however, that not all individuals with gender dysphoria require their preferred treatments.  *See, e.g.*, Dkt. 7-2, at 6 ("social transition and gender-affirming … care … are medically necessary for *many* people" (emphasis added)); Dkt. 179-1, at 4.  In other words, even on plaintiffs' view, it is possible that BOP could successfully address some class members' gender dysphoria through other treatments.  Plaintiffs thus cannot demonstrate that all (or even most) class members will be irreparably harmed by the Policy's hormone and social-accommodation provisions.

The court acknowledged that "not every class member requires the same treatment," Add.27, but asserted that because "members are injured by virtue of their gender dysphoria diagnosis alone, … individualized findings [are] unnecessary," Add.31.  That conclusory claim is incorrect.  The mere fact that all class members have a gender-dysphoria diagnosis cannot establish irreparable harm to the entire class if BOP's proposed treatments will be sufficient for many members.

Thus, even on plaintiffs' own theory of harm, the injunction is broader than necessary to afford relief to those members of the class who would be harmed by the Policy.  It thus violates traditional principles of equity, *see Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025), and the more demanding requirements of the PLRA, 18 U.S.C. § 3626(a)(2).

## II.    The Remaining Factors Favor A Stay.

The public interest and balance of equities factors—which merge here, *Nken*, 556 U.S. at 435—are identical to those this Court previously considered in staying the district court's May 26 injunction prohibiting enforcement of this same policy.  *See* June 17 Order 2-4; Stay Motion 19-23, *Kingdom v. Trump*, No. 26-5181 (D.C. Cir. May 29, 2026); Stay Opposition 14-15, No. 26-5181 (June 4, 2026).  They support another stay.

As this Court recognized in granting the government's prior stay motion, "the Government is irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the Government," and "[t]hat is especially true here," where, at a minimum, "the injunction entered exceeded the district court's equitable authority" as limited by the PLRA. June 17 Order 3 (citation modified).

The Policy reflects BOP's considered view about the appropriate course of treatment of gender dysphoria for inmates in BOP's custody, particularly in light of the unique administration and security concerns of the prison environment. The Executive Branch is entitled to broad deference in such matters. *See Turner v. Safley*, 482 U.S. 78, 89-90 (1987). But the district court has again compelled BOP to provide treatments that it believes are medically unsupported and involve unjustified risks.

Conversely, plaintiffs have not demonstrated that a stay would cause them irreparable harm or that the equities weigh in their favor. Under the Policy, BOP would administer appropriate care to plaintiffs through individualized treatment plans involving the tapering of hormones and provision of psychotherapy and other suitable treatment. *See* Add.40-41. And the Policy recognizes that in narrow circumstances "cessation of hormones" "may not be appropriate" in an inmate's "initial tapering plan."

Add.41. At a minimum, neither plaintiffs nor the district court have identified a basis for inferring irreparable harm on a class-wide basis.

The equities and public interest thus decidedly favor permitting BOP to pursue the President's policy determinations and to act on its expert judgment concerning the provision of medical care in prisons.

## CONCLUSION

This Court should grant a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
CHARLES W. SCARBOROUGH
McKAYE L. NEUMEISTER
 */s/ Domenic A. Canonico*
DOMENIC A. CANONICO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Domenic.Canonico@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,198 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ Domenic A. Canonico*
Domenic A. Canonico