**ATTACHMENT A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ALISHEA KINGDOM**, *et al.*,

    *Plaintiffs,*

v.

    **Case No. 1:25-cv-691-RCL**

**DONALD TRUMP**, *et al.*,

    *Defendants.*

## ORDER GRANTING PLAINTIFFS' MOTION FOR AN
## UPDATED PRELIMINARY INJUNCTION AND TO STAY AGENCY ACTION

Upon consideration of [179] Plaintiffs' Motion for an Updated Preliminary Injunction and to Stay Agency Action ("Motion"), the opposition and reply, and the entire record herein,

It appearing to the Court that Plaintiffs are likely to succeed on the merits of their action, that they will suffer irreparable injury if the requested relief is not issued, and that the balance of the equities and public interest favor the entry of such an order, it is therefore

**ORDERED** that Plaintiffs' Motion is **GRANTED**; it is further

**ORDERED** that the Bureau of Prisons' ("BOP") February 19, 2026 Program Statement 5260.01 (the "Program Statement") is stayed pursuant to 5 U.S.C. § 705. It is further

**ORDERED** that Defendants Todd Blanche, William K. Marshall, III, Christopher A. Bina, Dana R. DiGiacomo, and Shane Salem, in their official capacities, and their contractors, employees, and agents (i) are enjoined from enforcing Program Statement 5260.01, and (ii) shall provide and continue providing Plaintiffs and class members with gender-affirming care in accordance with BOP policy and practice in effect immediately prior to the issuance of Executive Order 14168 on January 20, 2025. It is further

1

**Add.1**

**ORDERED** that this injunction shall be effective upon service on the Defendants, and no bond shall be required.

In accordance with the Prison Litigation Reform Act, the Court finds that this preliminary injunction is narrowly drawn, extends no further than necessary to correct the harm that the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm. 18 U.S.C. § 3626(a)(2). Plaintiffs have shown a substantial likelihood of success on their claims that application of the Program Statement to class members would be unlawful and would cause them immediate, irreparable harm. Because applying the Program Statement to Plaintiffs and class members would cause such serious and irreparable harm, a preliminary injunction preventing such application is necessary to correct the harm and is the least intrusive means necessary to do so. Furthermore, because this preliminary injunction prevents the application of the Program Statement, and Plaintiffs have demonstrated a likelihood of success on the merits and immediate, irreparable harm if that application is not enjoined, this Order extends no further than necessary to correct the harm that requires this preliminary relief. Finally, this Court has considered any adverse impact on public safety or on the operation of the criminal justice system caused by this relief and has given substantial weight to such impacts. After this consideration, the Court has concluded and so finds that no adverse impacts on public safety or the operation of the criminal justice system will result from maintaining the status quo of the class members' medical care while this litigation proceeds.

**IT IS SO ORDERED.**

Date: _____ June 17, 2026 _____

Royce C. Lamberth
United States District Judge

2

**Add.2**

**ATTACHMENT B**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALISHEA KINGDOM**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:25-cv-691-RCL** |
| **DONALD J. TRUMP**, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

Plaintiffs in this dispute are inmates in the custody of the Bureau of Prisons ("BOP") who have been medically diagnosed with gender dysphoria. During their periods of incarceration, BOP has provided Plaintiffs with hormone therapy, social accommodations, and surgery (collectively "gender-affirming care"), to mitigate the negative psychological effects of their condition. On January 20, 2025, President Trump issued Executive Order ("EO") 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Section 4(c) of the EO provides that federal funds shall not be spent on any medical treatment for the purpose of conforming an inmate's appearance to that of the opposite sex. BOP subsequently promulgated two Implementing Memoranda to guide the agency's execution of the EO's commands. On June 3, 2025, this Court stayed both Implementing Memoranda pursuant to 5 U.S.C. § 705, enjoined Defendants from enforcing the EO as applied to gender-affirming care, and ordered BOP to provide gender-affirming care in accordance with BOP policy and practice in effect immediately prior to the issuance of the EO on January 20, 2025. This Court also certified

1

**Add.3**

a class consisting of "all persons who are currently or will be incarcerated in BOP facilities with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future."

On February 19, 2026, BOP Issued Program Statement 5260.01 ("the Program Statement"), titled "Management of Inmates with Gender Dysphoria," that superseded the original Implementing Memoranda. Like those Memoranda and the EO, the Program Statement is a near total ban on gender-affirming care. At bottom, the Program Statement seeks to provide only psychotherapy and psychotropic medication to treat gender dysphoria. Plaintiffs, on behalf of the class, have moved to preliminarily enjoin enforcement of the Executive Order and the Program Statement, and to stay the Program Statement while this litigation is pending. For the reasons that follow, Plaintiffs' Motion is **GRANTED** with a modification to the scope of the requested injunction.

With this Opinion, the Court has no intention of wading into the culture war being waged against transgender individuals. As detailed below, the Court simply decides whether the Bureau of Prisons followed mandatory administrative procedure when it issued its new policy concerning the provision of gender-affirming care to inmates diagnosed with gender dysphoria.

## I.    BACKGROUND

Before considering the merits of Plaintiffs' challenge to the Program Statement, the Court finds it necessary to summarize the evidence both parties present regarding gender-affirming care, as well as the factual background of the new policy and the procedural history of this case.

### A. Gender Dysphoria and Gender-Affirming Care

Gender dysphoria is a serious medical condition codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM). Declaration of Dr. Dan H. Karasic in Support of Plaintiffs' Motion for a Preliminary Injunction ("First Karasic Decl.") ¶ 48, ECF No 7-2. The term "gender dysphoria" describes distress related to the

incongruence between one's gender identity and attributes related to one's sex assigned at birth. *Id.* ¶ 47. "The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* ¶ 49. "When untreated, gender dysphoria can cause significant distress including increased risk of depression, anxiety, self-harm and suicidality." *Id.* ¶ 51. Defendants do not contest that gender dysphoria exists and that it can have serious manifestations. Where the parties split is over the medical necessity and efficacy of several modes of treatment collectively known as "gender-affirming care." That care includes hormone therapy, social accommodations to help patients live in line with their gender identities, and surgery when clinically indicated. Plaintiffs present evidence that gender-affirming care is widely accepted and effective to treat gender dysphoria. Defendants, by contrast, point primarily to caselaw and the declaration of a single medical expert with little experience treating gender dysphoria to demonstrate an emerging "medical debate" over the efficacy and risks associated with this care.

Through the declarations of medical expert Dr. Dan H. Karasic,[1] Plaintiffs present evidence of what they characterize as the dominant medical view on gender-affirming care. That view is summarized as follows: Gender dysphoria is amenable to treatment and the prevailing treatment for it—gender-affirming care (including hormone therapy, social transition, and surgery when clinically indicated)—is highly effective. *Id.* ¶¶ 50–52, 64, 66. Gender-affirming care can eliminate the distress of gender dysphoria by helping patients live consistently with their gender

---

[1] Dr. Karasic, is a psychiatrist and Professor Emeritus of Psychiatry at the University of California – San Francisco. He has more than 30 years of experience treating patients with gender dysphoria, has served as the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, and previously sat on the Board of Directors of the World Professional Association for Transgender Health ("WPATH"). First Karasic Decl. ¶¶ 4–8, ECF No. 7-2. Dr. Karasic contributed to the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People and remains active in the work of WPATH. *Id.* ¶ 8.

identity.  *Id.* ¶¶ 63, 72.  It is supported by all major American medical and mental health professional organizations and is reflected in the clinical practice guidelines for the treatment of gender dysphoria that are regularly relied on by healthcare providers.  *Id.* ¶¶ 53–62.

Gender-affirming care has been studied for over half a century and decades of scientific research and clinical experience have demonstrated that social transition and hormone therapy are effective in treating gender dysphoria.  *Id.* ¶¶ 28, 72, 73; Declaration of Dr. Dan Karasic in Support of Plaintiffs' Motion for an Updated Preliminary Injunction ("Third Karasic Decl.") ¶ 24, ECF No. 179-2.  This evidence is of the type and quality that supports many other widely accepted medical treatments.  First Karasic Decl. ¶ 73, ECF No. 7-2; Third Karasic Decl. ¶ 25, ECF No. 179-2.  Moreover, there is substantial evidence that hormone therapy for treatment of gender dysphoria is safe and presents risks comparable to the risks associated with other well-accepted medical treatments, including the use of hormones to treat other conditions in cisgender individuals.  *See generally* Declaration of Dr. Ole-Petter Hamnvik ("Hamnvik Decl."), ECF No. 179-3.

For patients for whom gender-affirming care is clinically indicated, no alternative treatments have been demonstrated to be effective.  First Karasic Decl. ¶ 81, ECF No. 7-2.  Moreover, there is no evidence that psychotherapy or psychotropic medications on their own can alleviate the distress of gender dysphoria.  Third Karasic Decl. ¶¶ 41–45.  Gender-affirming care is, therefore, medically necessary.  First Karasic Decl. ¶ 28, ECF No. 7-2.  Denying individuals with gender dysphoria the ability to socially transition or obtain hormone therapy will predictably lead to mental health risks.  *Id.* ¶¶ 28, 39, 80, 82.  These risks include exacerbated depression, anxiety, suicidal ideation, and self-harm.  *Id.* ¶ 83.  In extreme cases, individuals may even resort to self-treatment by attempting to self-castrate or remove their own breasts.  *Id.* ¶¶ 83–84.

The government, for its part, suggests that the dominant view no longer enjoys consensus. To support the ban on gender-affirming care contained in the Program Statement, Defendants point to evidence throughout the administrative record that purports to demonstrate a "debate" in the medical community concerning the efficacy of and risks associated with gender-affirming care. That evidence primarily includes citations to other judicial opinions[2] and a declaration from medical expert Dr. Kristopher Kaliebe, a psychiatrist retained for the purposes of this litigation with limited experience treating patients with gender dysphoria. Declaration of Dr. Kristopher Kaliebe ("Kaliebe Decl.") ¶ 1, ECF No. 160-2; *see also* Deposition of Dr. Kristopher Kaliebe in *Keohane v. Dixon* ("Kaliebe Tr.") at 6 (16:07–16:10), 9–10 (20:9–21:10), ECF No. 179-5 (testifying that he has only ever treated around 6 to 8 adult patients with gender dysphoria out of approximately 20,000 patients over the course of his career).

The government argues that the "debate" in the medical community results from newly available information that WPATH is a political organization whose guidelines cannot withstand scientific scrutiny. Mem. in Opp'n to Mot. for Prelim. Injunction ("Opp'n") at 1–2, ECF No. 186. Specifically, the government claims that concerns about the body of research underlying the WPATH model have resulted in a "newer more rapidly evolving clinical landscape" that has hampered the identification of a universal standard of care. Administrative Record ("AR") at 3–8, ECF No. 186–1. As a result, the government notes that many European countries "have distanced themselves" from the WPATH standards and that leading organizations in the United

---

[2] The government repeatedly cites caselaw as demonstrating "medical debate." *See, e.g.*, Mem. in Opp'n to Mot. for Prelim. Injunction ("Opp'n") at 3, 17–19, 33–37, ECF No. 186. But judicial opinions state legal standards—they typically do not carry evidentiary value absent a court taking judicial notice of the facts established in them, and even then, a court must "reach its own, independent findings of fact" notwithstanding what other judges have said in prior cases implicating the same issues. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010); *see also* Fed. R. Evid. 201(b). Because the government has not attempted to argue that the factual assertions in these cases are deserving of judicial notice, the Court affords no evidentiary weight to these citations.

States are also reevaluating their clinical guidance. *Id.* at 4. The government does not suggest that the "debate" has resulted in medical consensus around any alternative treatment method, but nevertheless claims—primarily through the declaration of Dr. Kaliebe—that it is better to treat gender dysphoria with psychotherapy and psychotropic medications than with gender-affirming care. AR at 2613–18, ECF No. 186–2. *But see* Kaliebe Tr. at 46–47 (144:9–145:4), ECF No. 179-5 (admitting that there is no evidence showing that psychotherapy is efficacious in treating gender dysphoria).

After becoming aware of this "new" evidence and the "debate" in the medical community, the government concluded that it was necessary to revise its prior policy of providing gender-affirming care to inmates diagnosed with gender dysphoria.

## B. Factual Background & Procedural History

### 1. BOP's Treatment of Individuals with Gender Dysphoria Prior to the EO

BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a). BOP's Health Services Division is tasked with delivering "medically necessary health care to inmates effectively[,] in accordance with proven standards of care[, and] without compromising public safety concerns inherent to the Bureau's overall mission." Program Statement 6010.05 (June 26, 2014), *Health Services Administration* § 1, ECF No. 36-2. "Providing health care within a correctional environment presents unique challenges not encountered by practitioners elsewhere." *Id.* § 2. When there is an "incompatibility between medical and correctional guidelines," conflicts "should be resolved, as far as practical, in favor of medicine." *Id.* The Health Services Division follows certain "core principles," including that all inmates "deserve medically necessary health care" that is evidence based, meaning that it is "generally supported by outcome data." *Id.*

6

**Add.8**

Prior to the issuance of EO 14168, inmates in BOP's custody diagnosed with gender dysphoria received gender-affirming care when clinically indicated. Declaration of Dr. Cathy Thompson ("First Thompson Decl."), ¶ 33, Ex. B thereto ("2022 Transgender Offender Manual"), and Ex. C thereto ("2023 Clinical Guidelines"), ECF No. 7-3. That care applied well-accepted medical protocols, including the WPATH guidelines, to individualized patient need. *See generally* 2023 Clinical Guidelines, ECF No. 7-3. BOP first issued clinical guidelines concerning the care of individuals with gender dysphoria in 2017 and periodically updated those guidelines to more "closely align [them] with community standards." *Id.* at i. The guidelines were developed in response to the fact that transgender individuals in BOP custody were more likely to require services to manage mental health crises than other inmates who are not transgender. First Thompson Decl. ¶ 27, ECF No. 7-3. The guidelines were most recently updated in 2023 and included the provision of hormone therapy, social accommodations, and surgical interventions when clinically indicated.

In 2017, BOP issued the "Transgender Offender Manual," which called for individualized assessment for hormone therapy and other treatment in accordance with BOP's clinical guidelines, and also set forth the clothing and commissary policies applicable to transgender inmates. *Id.* ¶¶ 28, 32–38 and Ex. B thereto. To implement these policies, BOP's Health Services Division created a Transgender Clinical Care Team made up of physicians, pharmacists, and social workers. *Id.* ¶ 33. BOP also created a Transgender Executive Council, which was the "decisionmaking body on all issues affecting the transgender population." *Id.* ¶ 31. That body included senior correctional leaders from BOP's Women and Special Populations Branch as well as BOP's senior psychologist, psychiatrist, security expert, and medical administrator. *Id.*

**2. EO 14168 and the Original Implementing Memoranda**

On January 20, 2025, President Donald J. Trump signed an executive order, which provides in pertinent part:

> Sec. 4(c): The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medial care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.
>
> * * *
>
> Sec. 8(b): This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

Exec. Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order" or "EO").

Pursuant to the command contained in Section 4(c), BOP began the process of formulating a policy consistent with the Executive Order.  On February 21, 2025, BOP issued an implementing memorandum (the "First Implementing Memorandum") which provided, in relevant part, that "[n]o appropriated funds should be utilized to purchase any items that align with transgender ideology (e.g., binders, stand-to-pee devices, hair removal devices, etc.)" and that "[r]equests for clothing accommodations (e.g., issuance of smocks for male inmates and undergarments that do not align with an inmate's biological sex) will not be issued."  Compl. Ex.1 thereto ("First Implementing Memorandum"), ECF No 1-1.  On February 28, 2025, BOP issued another implementing memorandum providing that "Consistent with Executive Order (EO) 14168, . . . no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."  Compl. Ex. 2 thereto ("Second Implementing Memorandum"), ECF No. 1-2.

The three named plaintiffs in this case—transgender inmates who were diagnosed with gender dysphoria by BOP medical staff, who were in BOP's custody at the time that the Executive

Order and Implementing Memoranda were issued, and who remain in BOP custody today—initiated this action on March 7, 2025.  Compl. ¶¶ 1, 4, 24–26, ECF No. 1.

### 3.    June 3, 2025 Preliminary Injunction

On March 17, 2025, Plaintiffs moved for a preliminary injunction and for class certification.  Mot. for Prelim. Injunction, ECF No. 7.  On June 3, 2025, this Court certified a class consisting of "all persons who are currently or will be incarcerated in BOP facilities with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future," Mem. Op. at 27, ECF No. 67, stayed the Implementing Memoranda pursuant to 5 U.S.C. § 705, and enjoined Defendants from enforcing EO 14168 or the Implementing Memoranda, *id.* at 1–2.  This Court concluded that Plaintiffs were likely to succeed on the merits of their APA claim that the Implementing Memoranda were arbitrary and capricious based, in part, on the lack of a reasoned explanation for the policy.  *Id.* at 20–23.  As a result, this Court did not delve into the merits of Plaintiffs' Eighth Amendment claim.  *Id.* at 23.

After the preliminary injunction issued, Defendants informed Plaintiffs' counsel that BOP would not produce an administrative record for the Implementing Memoranda, and would instead produce an administrative record for the new policy it was working on when it issued.  Li Nowlin-Sohl Decl. ¶¶ 10–11, ECF No. 87–2.  On February 19, 2026, BOP issued Program Statement 5260.01, titled "Management of Inmates with Gender Dysphoria."  Notice of New BOP Policy, ECF No. 125.  Like the Implementing Memoranda and the EO, the Program Statement is a near total ban on gender-affirming care.

### 4.  Program Statement 5260.01

At bottom, the Program Statement (or policy) seeks to provide only mental health services and psychotropic medication to treat gender dysphoria.  It prohibits gender-affirming surgery,

hormone therapy, and social accommodations, with exceedingly few exceptions. *Id.* §§ 5(a)-(c), at 6–8.

The policy's "Treatment" section purports to establish "individualized, treatment plans that are tailored to the specific clinical needs of the inmate," *id.* § 5(a), at 6, but goes on to state that "[i]n general, identified medical and psychiatric comorbidities should be addressed before treatment for [gender dysphoria] proceeds," *id.* Indeed, the policy states that "[p]sychotherapy should be prioritized," and that further treatment for gender dysphoria may only "proceed once these medical and psychiatric comorbidities are resolved or ruled out as the potential cause of" gender dysphoria. *Id.* The policy then goes on to prohibit several modes of gender-affirming care for individuals who have not already received them, and to "taper" off those who have.

To begin, BOP will no longer provide sex trait modification surgeries to treat gender dysphoria. *Id.* § 5(b), at 7. For inmates who have already received these surgeries, medical care will be provided to address complications and resulting conditions. *Id.* Additionally, BOP will no longer provide social accommodations such as clothing and hair-removal devices to inmates diagnosed with gender dysphoria. *Id.* § 5(d), at 8. "If the inmate currently has social accommodations, the Bureau shall no longer provide the social accommodations and, when practicable, [will] remove or confiscate the social accommodations." *Id.*

Regarding the provision of hormone therapy, the Program Statement differentiates between several groups of inmates diagnosed with gender dysphoria. For those who are not currently receiving hormones, BOP will not provide hormone therapy to address gender dysphoria. *Id.* § 5(c)(i), at 7. For inmates who are currently receiving hormones, BOP will place "all such inmates" on a "tapering plan" that considers "the appropriate factors such as the duration the inmate has been receiving hormones to address [gender dysphoria], the initial rationale for

10
**Add.12**

receiving the hormone intervention, the response by the inmate to the intervention, and whether the inmate has undergone sex trait modification surgery." *Id.* § 5(c)(ii), at 7–8. For those who have "recently begun receiving hormones," the tapering plan will include "a rapid discontinuation" of hormones. *Id.* at 8. For inmates who have been receiving hormones "for an extended period of time," the tapering plan will include "an appropriately paced discontinuation of the hormone intervention." *Id.*

BOP places inmates who are (1) post-surgery or (2) have been receiving hormones for an "extended period of time *and* develop severe physiological and psychological withdrawal effects from tapering" in a category of their own. *Id.* (emphasis added). For these especially vulnerable individuals, "it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones." *Id.* However, even for these special groups, "tapering plans should be reevaluated regularly with respect to cessation of hormones." *Id.* Foreseeing that tapering may lead to complications, the Program Statement notes that for all groups, "[t]apering plans may be adjusted as necessary . . . but the adjusted tapering plans must still be consistent with the purpose of this policy." *Id.*

### 5. Administrative Record

On March 12, 2026, BOP filed a certified index of the administrative record associated with the Program Statement, AR, ECF No. 151, and produced the entire 3,000-page administrative record to Plaintiffs. Defendants represent that in revising its policy for the treatment of gender dysphoria, BOP "conducted extensive reviews of, among other things, relevant medical studies, state correctional policies, pertinent case law, prison administration and security concerns, and expert medical opinions." Opp'n at 7, ECF No. 186 (citing AR at 1–4, 5–47, ECF No. 186-1). Of note, the AR includes a four-page memo on the administrative record itself ("AR Memo"), as well

11

**Add.13**

as a 43-page policy memo ("Policy Memo") explaining the agency's reasoning for the new policy. In sum, the agency concluded that due to new evidence of a debate in the medical community regarding the efficacy of and risks associated with gender-affirming care, the benefits to inmates of providing such care no longer outweighed BOP's other security and prison-administration concerns. *See generally* Policy Memo, AR at 5–47, ECF No. 186-1. As a result, BOP decided it would no longer provide gender-affirming care and would instead use psychotherapy and psychotropic medication to treat gender dysphoria. *Id.* at 29–30.

### 6. Motion for an Updated Preliminary Injunction

On April 29, 2026, Plaintiffs Alishea Kingdom, Solo Nichols, and Jas Kapule, on behalf of all class members, filed a supplemental complaint to challenge the new policy, Supp. Compl., ECF No. 182, and moved this Court for a preliminary injunction enjoining Defendants, their contractors, employees, and agents (1) from enforcing Executive Order 14168 as applied to medical care and social accommodations for people in BOP custody and from enforcing Program Statement 5260.01, and (2) to provide Plaintiffs and class members gender-affirming care in accordance with BOP policy and practice in effect immediately prior to the issuance of the EO on January 20, 2025. Mot. for Prelim. Injunction, ECF No. 179. Additionally, Plaintiffs moved for a stay of the Program Statement pursuant to 5 U.S.C. § 705. *Id.* On May 13, 2026, Defendants opposed the motion and filed a motion for summary judgment on all of Plaintiffs' claims. Opp'n, ECF No. 186. On May 27, 2026, this Court held a hearing on the motion for preliminary injunction. Today, the Court decides only that motion.

## II.    LEGAL STANDARDS

### A. Preliminary Injunction

Preliminary injunctive relief is warranted if the movant meets its burden to show that (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm unless

preliminary relief is granted; (3) the balance of the equities favors a preliminary injunction; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the preliminary injunction analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the analysis merge into one, because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating these factors, a Court must bear in mind that preliminary injunctive relief is an extraordinary form of relief that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (cleaned up). A motion to stay agency action pending review under 5 U.S.C. § 705 is governed by the same standard. *Green Oceans v. U.S. Dep't of the Interior*, No. 24-cv-141-RCL, 2024 WL 3104945, at *2 n.3 (D.D.C. June 24, 2024).

### B. Judicial Review Under the APA

The Administrative Procedure Act provides for judicial review of final agency action. 5 U.S.C. §§ 702, 704. A reviewing court must "hold unlawful and set aside agency action" that is, among other defects, "arbitrary, capricious, . . . or otherwise not in accordance with law." *Id.* § 706(2). The APA generally limits judicial review to the administrative record. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). Moreover, "to the extent necessary to prevent irreparable injury," the APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.* § 705. "The four-factor standard used by courts for a motion to stay agency action is the same

legal standard as that used in a motion for preliminary injunction." *Hill Dermaceuticals, Inc. v. U.S. Food & Drug Admin*, 524 F.Supp.2d 5, 7 (D.D.C. 2007).

## III.   DISCUSSION

### A.   The Court's Jurisdiction to Enjoin Enforcement of the EO

Plaintiffs moved this Court for a preliminary injunction enjoining Defendants, their contractors, employees, and agents (1) from enforcing Executive Order 14168 as applied to medical care and social accommodations for people in BOP custody and from enforcing Program Statement 5260.01, and (2) to provide Plaintiffs and class members gender-affirming care in accordance with BOP policy and practice in effect immediately prior to the issuance of the EO on January 20, 2025.  ECF No. 179.  Additionally, Plaintiffs moved for a stay of Program Statement 5260.01 pursuant to 5 U.S.C. § 705.

Defendants argue that this Court lacks jurisdiction to enjoin enforcement of the executive order.  Plaintiffs counter that the Court has already done so in this case.  *See* Mem. Op. at 1–2, ECF No. 67 (enjoining Defendants from enforcing the EO "as applied to medical hormone therapy and social accommodations for people in the custody of BOP").  While that may be true, it is also true that jurisdiction was not contested when this Court issued its June 3, 2025 preliminary injunction.  At this early stage of litigation and without more extensive briefing, the Court declines to take up this question on an expedited basis.  Instead, the Court grants Plaintiffs' injunction with the following modification:

> Defendants, their contractors, employees, and agents are enjoined (1) from enforcing Program Statement 5260.01, and (2) are ordered to provide Plaintiffs and class members gender-affirming medications and social accommodations in accordance with BOP policy and practice in effect immediately prior to the issuance of the EO on January 20, 2025.  Additionally, Program Statement 5260.01 is stayed pursuant to 5 U.S.C. § 705.

### B.   The Plaintiffs Are Likely to Succeed on the Merits of their APA Claim

14

**Add.16**

Plaintiffs argue that the Program Statement violates the APA on multiple grounds.  First, because the APA requires courts to set aside unconstitutional agency action, and here the Program Statement violates the Eighth Amendment.  Second, because the Program Statement is arbitrary and capricious based on its lack of reasoned decisionmaking.  *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019).  The Court agrees that the Program Statement amounts to arbitrary and capricious action and accordingly holds that Plaintiffs are likely to succeed on the merits of their APA claim.  The Court declines to reach Plaintiffs' constitutional arguments at this time, and accordingly does not take up this aspect of Plaintiffs' APA claim.

"[A]s a matter of judicial restraint and 'governance,' courts generally should endeavor to resolve cases on non-constitutional grounds and should entertain constitutional questions only when necessary."  *Uthman v. Trump*, 486 F. Supp. 3d 350, 356 (D.D.C. 2020) (Lamberth, J.) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346 (1936)).  It stands to reason that the need for such "judicial restraint" is heightened in cases, such as the one at hand, where the factual record is necessarily thin due to the procedural posture of the litigation.  Therefore, because the Court assesses that Plaintiffs are likely to prevail on their APA claim, the Court need not delve into the merits of their Eighth Amendment claim at this time.

## 1.  The Plaintiffs Are Challenging Final Agency Action

As a threshold matter, the Court must determine whether BOP's actions constitute "final agency action" susceptible to APA review.  5 U.S.C. § 704.  Executive orders themselves are not susceptible to APA review for the simple reason that "the President is not an 'agency' under" the APA.  *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996); *see also League of United Latin Am. Citizens v. Exec. Off. of President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025) (holding that because the President is not an agency, "the APA does not supply a cause of action

to challenge an executive order"). However, where the President delegates the implementation of an executive order to an agency, that agency's actions are not derivatively shielded from APA review. *See Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (holding that an "attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to" an agency did "not have support in precedent"); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement [Presidential] Proclamations, they are wrong.") (emphasis omitted); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) ("The Court . . . need not pause over the fact that presidential actions are not themselves subject to APA review because it is the Rule, and not the Proclamation, that has operative effect.") (citation omitted).

Here, such a delegation plainly appears on the face of the Executive Order. *See* EO 14168 Sec. 4(c) (instructing the Attorney General and BOP to "revise[] [BOP's] policies concerning medical care to be consistent with this order"). Moreover, the Program Statement itself states that the "Bureau will comply with . . . Executive Order [14168] unless compliance with the Executive Order is prohibited by a court injunction or court order." Program Statement § 5, at 5–6, ECF No. 125. As a result, BOP's actions taken pursuant to this directive, including the Program Statement, do not partake of the President's exemption from APA review.

Having determined that the actions challenged here are those of an "agency," the next question is whether they are "final." An agency's action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow . . . .'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,

400 U.S. 62, 71 (1970)).  Both aspects of the *Bennett* test are met here.  BOP's mind was made up as to its obligation to provide gender-affirming care by the time the Program Statement was issued on February 19, 2026.  The only reason the new policy has not yet taken effect is because of the existence of this Court's preliminary injunction that was first issued on June 3, 2025.  So even though the Program Statement has not yet been applied to class members, BOP's "decisionmaking process" undergirding the future termination of Plaintiffs' gender-affirming treatments is complete, which is all that *Bennett* requires.  Moreover, the government does not dispute that the Program Statement represents final agency action.

### 2.  The Plaintiffs Have Demonstrated a Likelihood that BOP's Action Was Arbitrary and Capricious

The APA provides that agency action may be set aside if it is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(a).  Agency action is arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Id.*  "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiffs contend that the Program Statement is arbitrary and capricious for several reasons, including that BOP did not properly consider its own prior experience providing gender-affirming care to inmates diagnosed with gender dysphoria, and because the Program Statement's

prohibition on gender-affirming care is objectively unreasonable given the evidence before the agency. For these reasons, Plaintiffs argue that the Program Statement was preordained, rests on a pretextual basis, and is reverse engineered to implement the Executive Order. The government disputes each of these claims and points to the 3,000-page administrative record as containing ample evidence of its reasoned decisionmaking. For the reasons that follow, the Court agrees with Plaintiffs and holds that the Program Statement amounts to arbitrary and capricious agency action.

> *(i) BOP Did Not Properly Consider Its Own Experience Providing Gender-Affirming Care Under the Prior Policy.*

The D.C. Circuit has held that "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). "This proposition may be deduced from case law applying the substantial evidence test, under which an agency cannot ignore evidence contradicting its position." *Id.* Here, Plaintiffs contend that the government failed to consider critical information it had in its possession when formulating the Program Statement: BOP's own experience providing gender-affirming care to inmates diagnosed with gender dysphoria for many years under its prior policy. Based on the current record, the Court agrees that Defendants did not adequately consider this experience.

The government states that in revising its medical policies on gender-affirming care, it "considered the relevant issues," including among other things: "extensive reviews of existing research, medical expert opinions, medical journals, national media reports, recent medical studies, state correctional policies, BOP's prior policies, and pertinent case law." AR Memo at 1, ECF No. 160-1. Based on this review, the government concluded that gender-affirming care is "unproven" and "not medically necessary to treat gender dysphoria, *especially* in the correctional context," Policy Memo at 5, 9, 12, 20–21, ECF No. 160-2 (emphasis added). It also concluded that these

treatments pose "serious security and prison-administration concerns" within BOP facilities.  *Id.* at 14, 24.  As a result, BOP decided that with very limited exceptions, it would no longer provide gender-affirming care to inmates diagnosed with gender dysphoria.

These conclusions imply that the government considered evidence *from* the correctional environment when formulating its new policy.  Indeed, the government acknowledges that it reviewed "five different state correctional policies (Florida, California, Kentucky, Oklahoma, and Minnesota) to understand how those states address gender dysphoria in the correctional context." Opp'n at 8 (citing AR 3).  To be sure, this evidence is relevant to BOP's new policy.  But the government has other relevant evidence of the efficacy and safety of gender-affirming care in correctional facilities—its own experience providing this care to inmates diagnosed with gender dysphoria for nearly a decade.

Recall that BOP first issued clinical guidelines concerning the care of individuals with gender dysphoria in 2017 and periodically updated those guidelines to more "closely align [them] with community standards."  2023 Clinical Guidelines at i, ECF No. 7-3.  The guidelines were most recently updated in 2023 and included the provision of hormone therapy, social accommodations, and surgical interventions when clinically indicated.  In addition, in 2017, BOP issued the "Transgender Offender Manual," which called for individualized assessment for hormone therapy and other treatment in accordance with BOP's clinical guidelines and also set forth the clothing and commissary policies applicable to transgender inmates.  First Thompson Decl. ¶¶ 28, 32–44, 38 and Ex. B thereto, ECF No. 7-3.  To implement these policies, BOP's Health Services Division created a Transgender Clinical Care Team made up of physicians, pharmacists, and social workers.  *Id.* ¶ 33, Ex. C thereto at 1.  BOP also created a Transgender Executive Council, which was the "decisionmaking body on all issues affecting the transgender

population." *Id.* ¶ 31, Ex. B thereto at 4. That body included senior correctional leaders from BOP's Women and Special Populations Branch as well as BOP's senior psychologist, psychiatrist, security expert, and medical administrator. *Id.* ¶ 31.

And yet, the government does not meaningfully discuss this experience anywhere in the 43-page Policy Memo supporting the Program Statement. Despite providing gender-affirming care to inmates in its custody for years, the government cites in the Program Statement zero evidence from its own medical or mental health professionals to support its conclusions. Moreover, the government does not point the Court to evidence that gender-affirming care was ineffective or harmful to its own inmates diagnosed with gender dysphoria, or that providing this care previously led to security concerns at BOP facilities.

In its opposition to Plaintiffs' motion, the government argues that the APA does not require it to scrutinize "any particular documents" concerning inmates' treatment histories under the prior policy, "especially here where many of the BOP senior officials who wrote, consulted[,] and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating" the Program Statement. Opp'n at 32, ECF No. 186. The government claims that "those officials" used their "experience with the prior policy to help formulate the 2026 Policy." *Id.* at 31 (internal quotation marks omitted). But this claim is not supported by the Policy Statement or the AR, and instead, it comes solely from the declaration of BOP Medical Director Dr. Elizabete Stahl, which appears in the record for the first time as an attachment to Defendants' opposition. *See generally* Stahl Decl., ECF No. 186-3.

Notwithstanding the fact that Dr. Stahl goes on to essentially concede that the government did *not* consider its own experience, *see id.* ¶ 16 (attesting that the treatment histories of BOP inmates would not be helpful because "there is not a vetted, or validated clinical instrument that

**Add.22**

measures the success or failure of gender dysphoria treatment"), her declaration cannot be credited. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (internal quotation marks omitted).  Post-hoc rationalizations during litigation cannot replace the type of reasoned analysis the government must undertake at the front end.  *See American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) (stating that "the post-hoc rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").  Here, the government does not invoke this evidence from Dr. Stahl anywhere in the administrative record.  Moreover, Dr. Stahl's declaration is dated May 12, 2026—nearly three months after BOP formally announced the Program Statement.  Stahl Decl. at 7, ECF No. 186-3.  Thus, Dr. Stahl's post-hoc statements cannot ameliorate the government's failure to demonstrate that it meaningfully considered its prior experience.

Accordingly, the Court finds that the Program Statement amounts to arbitrary and capricious agency action because the government failed to seriously consider its own experience providing gender-affirming care to inmates for years under its prior policy.

> *(ii) The Program Statement is Objectively Unreasonable Given the Evidence Before the Agency.*

The Program Statement is separately arbitrary and capricious because it reaches a conclusion "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," as evidenced by its explanation, which "runs counter to the evidence before the agency." *Evergreen Shipping Agency (Am.) Corp. v. Federal Mar. Comm'n*, 106 F.4th 1113, 1117 (D.C. Circ. 2024) (quoting *State Farm*, 463 U.S. at 43).  "Such illogical decisions are not rationally

connected to the facts and are thus arbitrary and capricious." *Markel v. Del Toro*, 2025 WL 304875, at *6 (D.D.C. Jan. 27, 2025).

Instead of relying on BOP's own medical or mental health professionals, the agency supports its new policy with a declaration by a doctor it retained specifically for this litigation, who has limited experience treating gender dysphoria, and who promotes a treatment for gender dysphoria that he himself acknowledges is not evidence based. *See* Kaliebe Tr. at 9–10 (20:9–21:10), ECF No. 179-5 (conceding minimal experience treating individuals diagnosed with gender dysphoria); *id* at 46–47 (144:9–145:4) (admitting that no evidence supports psychotherapy as a treatment for gender dysphoria). But as Plaintiffs have demonstrated, the evidence before the agency suggests that denying gender-affirming care to patients for whom such care is medically necessary can lead to a deterioration in mental health and increase depression, anxiety, and self-harm rates. *See* First Karasic Decl. ¶¶ 39, 80–85, ECF No 7-2. And whereas the government provides no support for its assertion that gender-affirming care could increase self-harm, Policy Memo at 24, ECF No. 160-2, Plaintiffs' experts—who unlike Dr. Kaliebe, have considerable experience treating gender dysphoric patients—testify that this claim is unfounded, Third Karasic Decl. ¶ 49, ECF No. 179-2; Second Thompson Decl. ¶ 29, ECF No. 179-4.

An agency's judgment "must be based on logic and evidence, not sheer speculation." *Council of Parent Att'ys and Advocates v. Devos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (quoting *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 708 (D.C. Cir. 2014)) (cleaned up). Banning evidence-backed care for an alternative that has no evidentiary support is an "implausible strategy" to treat gender dysphoria, *Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985), to say the least. Nor can the government's attacks on the WPATH standards of care overcome decades of research and clinical experience demonstrating the efficacy of gender-

affirming care.  *See* Third Karasic Decl. ¶ 60, ECF No. 179-2.  Thus, the government has not

demonstrated a reasonable basis to adopt a policy prohibiting this care.  Because the Program

Statement does not follow from the evidence in the record, it is likely arbitrary and capricious.

> *(iii) The Program Statement is Pretextual and Reverse Engineered to Implement EO 14168.*

Finally, Plaintiffs contend that the Program Statement violates the APA because it is

pretextual, preordained, and reverse engineered in response to this litigation to implement EO

14168's directives.  Mot. at 34–36, ECF No. 179-1.  To support this claim, Plaintiffs point to

identical language contained in the Program Statement and the EO, BOP's failure to consider its

prior experience, and the lack of a rational connection between the evidence and BOP's new

policy.  *Id.*  Defendants counter that the Program Statement could not be pre-ordained because it

is the result of approximately 12 months of study, and in any event the policy *is* rationally

connected to the facts found during that time.  Opp'n at 30–31, ECF No. 186.  The Court is not

convinced.

When the record reveals that an agency "preordained [its] decision," *Miot v. Trump*, 818

F. Supp. 3d 126, 175 (D.D.C. 2026), *cert granted before judgment*, 2026 WL 731087 (U.S. Mar.

16, 2026), and the agency merely "reverse engineered" a policy to justify the same outcome—

thereby engaging in a "pretextual" action, *Saget v. Trump*, 375 F. Supp. 3d 280, 361 (E.D.N.Y.

2019) (quoting *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 176 (4th Cir. 2018)),

that is itself a violation of the APA.  Based on the existing record, the Court finds that is the case

here.

Recall that the stated intent of the Program Statement "is for federal funds to not be

expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's

appearance to that of the opposite sex."  Program Statement 5260.01 § 8, at 9, ECF No. 125.  That

23

**Add.25**

language comes directly from EO 14168, a fact the Program Statement acknowledges directly. *Id.* § 5, at 5–6 ("Executive Order 14,168 . . . prohibits the Bureau from expending federal funds for 'any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex' . . . . The Bureau will comply with this Executive Order unless compliance with the Executive Order is prohibited by a court injunction or court order."). Nevertheless, BOP insists that, even though the EO "supports this policy, the Bureau also adopts this policy independently" of the EO. *Id.* § 5, at 6. As Plaintiffs say, "[t]he suggestion that BOP happened to independently reach the same result as the one required by the EO is preposterous." Mot. at 36, ECF No. 179-1. It is more likely, given the record before the Court, that the government disregarded significant evidence in its possession to reach the EO's mandated result.

The Court's conclusions in subsections (B)(2)(*i*)–(*ii*) provide further evidence of pretext. If the government intended to form a policy based on the evidence, one would expect it to have seriously considered its own experience providing gender-affirming care to inmates in its custody. Moreover, the government would not have concluded that this care is "not medically necessary" and "poses security and prison-administration concerns" despite ample record evidence to the contrary. Plaintiffs theorize that after this Court enjoined BOP's original Implementing Memoranda for lack of even a basic explanation, the agency "cherry-picked" materials to support the same predetermined policy choice. Mot. at 36, ECF No. 179-1 (quoting *Afr. Communities Together v. Noem*, 2026 WL 395732, at *10 (D. Mass. Feb. 12, 2026)). The government disputes this series of events. Instead, it argues that the new policy is more than a mere repacking of the 2025 Implementing Memoranda because it took nearly 12 months to create. This argument is unavailing. No length of consideration can convince the Court that a policy is anything other than pretext when the agency has not demonstrated that it considered the relevant evidence and drew a

reasonable conclusion from that evidence.  Because the Program Statement appears to be pretextual, it is arbitrary and capricious under the APA.

Having found that BOP's prohibition on gender-affirming care is likely arbitrary and capricious under the APA, the Court leaves Plaintiffs' Eighth Amendment claims for another day.

## C.  The Plaintiffs Have Shown Sufficient Likelihood of Irreparable Harm

To obtain a preliminary injunction, Plaintiffs must demonstrate that irreparable injury "is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted).  Irreparable harm results where damages cannot adequately compensate for the loss if the injunction is denied. *National Senior Citizens Law Center, Inc. v. Legal Services Corp.*, 581 F. Supp. 1362, 1372 (D.D.C. 1984).

Recall that all class members have "a current diagnosis of gender dysphoria or [will] receive such a diagnosis in the future."  Mem. Op. at 27, ECF No. 67.  Plaintiffs have put forward evidence that gender-affirming care is the only effective treatment for gender dysphoria, and that severe harms flow from the cessation of such care.  While not every class member requires the same treatment for their gender dysphoria, Plaintiffs argue that irreparable harm flows from the government's categorical ban on the only type of care that is effective at treating their condition. On this record, the Court finds that Plaintiffs have carried their burden of showing irreparable harm.

### 1.  Efficacy of Gender-Affirming Care

Through their expert, Dr. Dan Karasic, Plaintiffs assert that a substantial body of research and clinical experience has proven that gender-affirming care is effective in treating gender dysphoria, and that this conclusion is widely held in the medical community.  First Karasic Decl. ¶¶ 72–76, 78, ECF No. 7-2; Third Karasic Decl. ¶¶ 32–35, ECF No. 179-2.  According to Dr.

Karasic, every major medical and mental health professional organization in the United States recognizes the efficacy of gender-affirming care, including the American Medical Association, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society.  Third Karasic Decl. ¶ 33, ECF No. 179-2; *see also id.* ¶ 11 (opining that "social transition and hormone therapy for the treatment of adults with gender dysphoria are not the subject of controversy or debate within the medical and mental health fields" and that "[t]o the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria").  Dr. Karasic further attests that, those "[f]or whom gender affirming medical care is indicated, no alternative treatments have been demonstrated to be effective."  First Karasic Decl. ¶ 70, ECF No. 7-2.  "Denying patients with gender dysphoria the ability to socially transition or obtain gender-affirming medical care where indicated predictably will lead to significant deterioration in mental health."  *Id.* ¶ 82.

It's true that the government puts forward some evidence to contest these conclusions.  *See* Kaliebe Decl., ECF No. 160-3.  There is, however, a clear winner in the battle of the experts.  Only Plaintiffs have put forward evidence attested to by medical professionals with meaningful experience treating people with gender dysphoria.  The government's evidence comes principally from Dr. Kaliebe, a psychiatrist hired by DOJ to be its "psychiatric expert."  Stahl Decl. ¶ 41, ECF No. 186-3.  As mentioned, Dr. Kaliebe has limited experience treating patients with gender dysphoria.  Kaliebe Tr. at 9–10 (20:9–21:10), ECF 179-5 (testifying that he has only ever treated around 6 to 8 adult patients with gender dysphoria out of approximately 20,000 patients over the course of his career).  Similarly, BOP's Medical Director, Dr. Stahl, who "consult[ed] with" Dr. Kaliebe, also has little experience treating gender dysphoria.  Stahl Decl. ¶¶ 13, 41, ECF No. 186-3 (admitting that she treated a "small number of patients").

What's more, although the government acknowledges that gender dysphoria is a serious disorder, the only treatment options it intends to provide are psychotherapy and psychotropic medication—even though Dr. Kaliebe has previously admitted that there is no evidence showing that psychotherapy is efficacious in treating gender dysphoria, Kaliebe Tr. at 46–47 (144:9–145:4), ECF No. 179-5, and Dr. Stahl has acknowledged that psychotropic medication treats co-morbidities, Stahl Decl. ¶ 6, ECF No. 186-3, not the condition of gender dysphoria itself, *see also* Third Karasic Decl. ¶¶ 41–48, ECF No. 179-2 (agreeing that these treatments do not ameliorate gender dysphoria).

The government also attempts to challenge the efficacy of gender-affirming care by suggesting that there is a lack of "high quality" research backing these treatments.  Opp'n at 8, ECF No. 186 (citing AR at 1552).  But Dr. Karasic explains that "high quality" research is a term of art generally referring to randomized controlled trials, while all other types of research are deemed "low quality" by comparison.  Third Karasic Decl. ¶¶ 25–26, ECF No. 179-2.  While randomized controlled trials may be the gold standard, they are often infeasible or unethical, and many widely accepted medical treatments are supported only by "low quality" evidence, such as cross-sectional and longitudinal observational studies—the same type and quality of research demonstrating the efficacy of gender-affirming care.  *Id.* ¶ 25.

Based on this record, the Court concludes that Plaintiffs have demonstrated that gender affirming care is the only effective treatment for gender dysphoria.  The Court now turns to the question of whether denying this medically necessary care gives rise to irreparable injury.

### 2.  Consequences of Denying Gender-Affirming Care

The named plaintiffs, along with other class members, have described the harms they faced when BOP previously denied them hormone therapy.  Declaration of Alishea Sophia Kingdom

("Kingdom Decl.") ¶¶ 21–22, ECF No. 7-4 (experiencing symptoms including anxiety, panic attacks, thoughts of self-harm and suicidal ideation when hormone therapy was withdrawn); Third Declaration of Solo Nichols ("Third Nichols Decl.") ¶ 3, ECF No. 179-7 (experiencing hot flashes, rapid mood swings, insomnia, and "unreasonable sad[ness]"); Third Kapule Decl. ¶¶ 2–9, ECF No. 179-8 (experiencing depression, anxiety, and worsening gender dysphoria); Declaration of Rebecca-James Meskill ("Meskill Decl.") ¶ 12–13, ECF No. 107-11 (experiencing worsening mental health and "feeling diminished in every aspect of life" due to "re-masculinizing" body). The government insists that this time will be different because it will provide class members with "individualized" tapering plans for their hormone therapy, along with mental health counseling. *See* Opp'n at 41–44, ECF No. 186. But even if the government's tapering process mitigates severe withdrawal symptoms, it will "not prevent the predictable serious harms of denying hormone therapy to those who have a medical need for it." Third Karasic Decl. ¶ 19, ECF No. 179-2. Put simply, there is reason to believe, based on the record, "that withdrawing people from hormone therapy they have been receiving to treat gender dysphoria"—regardless of the rate of tapering and regardless of the availability of psychotherapy—will "cause[e] significant mental health distress." *Id.* ¶ 21. And the same is true of the government's plan to confiscate class members' social accommodations. *Id.* ¶ 9; *see also* Supplemental Declaration of Solo Nichols ("Nichols Supp. Decl.") ¶ 6, ECF No. 56-1 (describing worsening mental health and gender dysphoria absent social accommodations); Declaration of Grace Pinson ("Pinson Decl.") ¶ 20, ECF No. 107-2 (same); Declaration of Valerie Simpkins ("Simpkins Decl.") ¶ 13, ECF No. 107-4 (same); Declaration of Justine Finley ("Finley Decl.") ¶ 11, ECF No. 107-6 (same); Declaration of Tiffany Larson ("Larson Decl.") ¶ 16, 107-12 (same); Declaration of Gigi Auliyaa ("Auliyaa Decl.") ¶ 9, ECF No. 107-13 (same).

The government next argues that under *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026), the Court is required to make individualized findings of each class member's risk. But in *Doe*, the Circuit held that fact-finding was required because the plaintiffs in that case expressly disclaimed the argument that BOP's categorical ban on housing transgender women in women's prisons was unlawful as to every transgender woman in BOP's custody. *See id.* at 916–18. Rather, the *Doe* plaintiffs argued on appeal that they possessed certain characteristics that made them particularly vulnerable to being housed in men's facilities. *Id.* at 916. Here, Plaintiffs argue that the government's categorical ban—which precludes medical professionals from prescribing a gender-affirming treatment plan based on an inmate's unique needs—puts all class members at risk of being denied medically necessary care. Unlike in *Doe*, the *Kingdom* class members are injured by virtue of their gender dysphoria diagnosis alone, making individualized findings unnecessary for irreparable harm purposes.

The record shows that denying class members gender-affirming hormone therapy and social accommodations will cause irreparable injuries, including the exacerbation of their gender dysphoria and increased risk of depression, anxiety, self-harm (including attempts to self-castrate), and suicidality. First Karasic Decl. ¶¶ 72, 83–86, ECF No. 7-2; *see also* Third Karasic Decl. ¶¶ 18–25, ECF No. 179-2 (detailing the harms associated with withholding medically necessary care to treat gender dysphoria). Plaintiffs have therefore carried their burden of showing irreparable harm.

**D. The Balance of the Equities and the Public Interest Favor an Injunction**

Where, as here, "the Government is the opposing party," the balance-of-equities factor and the public-interest factor "merge," *Nken*, 556 U.S. at, because "the government's interest *is* the public interest," *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). As this Court noted in its prior opinion, the "only deleterious public effect of the Court's

injunction will be to require that, during the pendency of the litigation, [] BOP will continue to shoulder" the "administrative cost" of gender-affirming care, which it had voluntarily "borne for many years prior" to the commencement of this action. Mem. Op. at 26, ECF No. 67. The same remains true today. Then, as now, the equities tilt in Plaintiffs' favor because their interests in receiving medically prescribed treatment outweighs the minimal cost to the government of continuing such treatment. The government also emphasized its interest in effectuating the administration's agenda, Opp'n at 44, ECF No. 186, but that consideration is outweighed by the public's interest in the government's adherence to the law.

Finally, the government raises the specter of prison safety, asserting that gender-affirming care leads to security and prison-administration concerns. *Id.* at 37. Though the Court does not discount the possibility that a highly feminized transgender woman faces threats to her safety in a men's facility (or that a highly masculinized transgender man faces the same in a women's facility), the government has not cited a single instance of gender-affirming care giving rise to safety concerns despite having provided such care for many years. This failure is conspicuous. The Court's previous injunction has been in place for more than a year, yet the government provides no evidence of gender-affirming care giving rise to prison safety issues during this time.

The balance of the equities therefore favor Plaintiffs.

### E. No Bond Should Be Required

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined." Fed. R. Civ. P. 65(c). "Courts in this Circuit have found the Rule vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no

bond at all." *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (cleaned up).  Here, Plaintiffs seek an injunction of illegal conduct by a government agency, and because there is little risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, the Court will waive the requirement for an injunction bond.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction will be **GRANTED**. Defendants, their contractors, employees, and agents are enjoined (1) from enforcing Program Statement 5260.01, and (2) are ordered to provide Plaintiffs and class members gender-affirming care in accordance with BOP policy and practice in effect immediately prior to the issuance of the EO on January 20, 2025.  Additionally, Program Statement 5260.01 is stayed pursuant to 5 U.S.C. § 705.  A separate Order consistent with this Opinion shall issue.

As stated, the Court does not wade into the culture war being waged against transgender individuals.  The Court simply concludes that the government violated the APA when it issued a new policy restricting the provision of gender-affirming care to inmates diagnosed with gender dysphoria.

Date: ___June 17, 2026___

Royce C. Lamberth
United States District Judge

31

**Add.33**

**ATTACHMENT C**

# U.S. DEPARTMENT OF JUSTICE
## Federal Bureau of Prisons



## PROGRAM STATEMENT
### Management of Inmates with Gender Dysphoria

*Let this be filed.*
*Royce C. Lamberth*
*U.S.D.J.*
*2/19/26*

| Approved by | William K. Marshall III |
|---|---|
| | Director, Federal Bureau of Prisons |
| DPI | RSD |
| Number | 5260.01 |
| Date | February 19, 2026 |

## 1. PURPOSE AND SCOPE

To establish professional guidelines for the mental health evaluation and treatment of inmates meeting the diagnostic criteria[1] for Gender Dysphoria[2] (GD) to assist their progress toward recovery, while reducing or eliminating the frequency and severity of symptoms and associated negative outcomes.

a. **Program Objectives**. Expected results of this program are:

■ To ensure inmates diagnosed with GD receive timely, appropriate mental health services and individualized treatment programming, as clinically indicated. Treatment shall target psychological distress/dysphoria as well as any co-occurring mental health disorders and be tailored to the unique needs of the inmate.

■ To allocate sufficient staff and resources to deliver appropriate services to such inmates.

■ To enhance staff's understanding of the mental health issues associated with individuals diagnosed with GD and the appropriate treatment that accounts for the evolving scientific understanding.

b. **Institution Supplement**. None required.

---

[1] As defined by the Diagnostic and Statistical Manual of Mental Disorders- 5th Edition, Text Revision (DSM-5-TR); American Psychiatric Association, 2022).

[2] *Id.* at 511-520.

**Add.34**

## 2. DEFINITIONS

**Clinical Group Psychotherapy**: a cognitive behavioral process by which a group of persons is led by a psychologist, licensed mental health professional, or qualified treatment specialist to guide interpersonal and intrapersonal growth through an examination of the persons' thoughts, feelings, experiences, and skills.

**Gender Dysphoria (GD)**: a mental health diagnosis currently defined by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5 TR), or its replacement. It is a psychological disorder caused by clinically significant distress or impairment due to the perceived discrepancy between a person's expressed/experienced gender identity and his or her biological sex.

**Gender Identity**: a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Individual Therapy**: a collaborative treatment based on the therapeutic relationship between the patient and psychologist, licensed mental health professional, or qualified treatment specialist, including, but not limited to, cognitive behavioral and dialectical behavioral therapy.

**Multidisciplinary Review Team (MRT)**: a multidisciplinary group of staff representing different disciplines, which has the responsibility for ensuring access to necessary assessment, treatment, continuity of care, and services to inmates in accordance with their identified mental health needs, and which collaboratively develops, implements, reviews, and revises the treatment plan. Additionally, institutions may request a review by the MRT of individual inmates based on treatment concerns or clinical consultation needs. The MRT is coordinated by the Psychology Services Branch (PSB), which is responsible for scheduling meetings, maintaining records, and documenting official notes. The MRT will consist of the following members (or their designee): (1) Psychology Services Branch (PSB) Administrator; (2) PSB, Chief of Mental Health; (3) Health Services Division (HSD) Chief Psychiatrist; (4) HSD Chief of Health Programs; (5) HSD Chief Pharmacist; (6) HSD Chief Social Worker; and (7) Women and Special Populations Branch (WASP) Administrator.

**Psychoeducational Group Intervention**: a didactic form of group therapeutic services designed to teach patients about their disorder and help them learn how to manage the related symptoms, behaviors, and consequences. These services may include workbook or homework activities, medication management, stress/anger management, prosocial skills training, coping skills exercises, and managing activities of daily living in a carceral setting.

**Sex Trait Modification Surgeries**: surgical procedures that seek to modify the person's physical characteristics to appear to align with the person's "gender identity" rather than the person's sex.

**Add.35**

Examples of these surgeries include vaginoplasty, phalloplasty, orchiectomy, vulvoplasty, hysterectomy, oophorectomy, mastectomy, metoidioplasty, chest reconstruction, breast augmentation, hair removal, facial feminization surgery, and voice modification. These surgeries are also called "cross-sex," "sex reassignment," or "sex rejection" surgeries.

**Social Accommodations**: items, including cosmetics and clothing, used to alter the person's appearance to align with the person's "gender identity." Examples of "social accommodations" include buttock padding, breast padding, binders, undergarments, makeup, and wigs.
Social Transition: the process by which a person begins to try to live and present in a way that aligns with their "gender identity" rather than the person's sex. This typically involves various non-medical actions, such as the use of "social accommodations" to alter the person's appearance to align with the person's "gender identity."

## 3. STAFF RESPONSIBILITIES

The following Bureau of Prisons (Bureau) components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for inmates diagnosed with GD.

### a. Central Office

The Psychology Services Branch (PSB), Reentry Services Division, provides oversight and consultation regarding services as they apply to inmates with a diagnosis of GD, including consultation, assessment, and the provision of advice and guidance related to the identification, evaluation, and recommendations for treatment needs of inmates with GD. Therapy will focus on reducing distress associated with GD, or any other mental health concerns that may be present. Mental health care is provided in the context of a collaborative therapeutic relationship with the inmate. Crisis intervention services are offered to inmates who may be experiencing acute distress or acute symptoms of mental illness to prevent self-directed harm (in accordance with Program Statement PS 5324.08, Suicide Prevention Program) or to provide relief from symptoms of mental illness and to prevent further decompensation.

The Health Services Division (HSD) oversees the treatment of inmates for all medical and psychiatric diagnoses. Services are offered to inmates in response to referrals by staff, inmate requests, or situational factors. Clinical guidance derived from the current body of research will be provided at the direction of the Medical Director and will be used to inform the clinical medical and psychiatric care of inmates.

The Women and Special Populations Branch (WASP) oversees the provision of non-medical services to meet the needs of federally incarcerated women and other federally incarcerated populations, including those individuals diagnosed with GD.

b. **Regional Offices**

Regional Offices provide oversight and consultation to institutions regarding services and care provided to inmates, including those diagnosed with GD.

c. **Wardens**

Wardens will establish a local multi-disciplinary approach for the management of inmates diagnosed with GD. The Chief Psychologist is the primary point of contact in the institution for issues related to this population and will consult, as needed, with the Executive Team, Captain, Clinical Director, Unit Manager, or other individuals, as appropriate. Institutions will consult with the Region, Central Office, and the MRT as necessary to ensure inmates diagnosed with GD receive clinically necessary mental health programming and medical services.

## 4. SCREENING AND EVALUATION

a. **Screening**

Diagnostic screening and evaluation of GD can occur at any time throughout an inmate's incarceration. All diagnostic evaluations are documented in the electronic health record as a *Diagnostic and Care Level Formulation* note. If primary care medical providers are diagnosing GD, the diagnosis will be documented in the electronic health record as a *Clinical Encounter* note.

If an inmate reports or presents a documented history of GD before incarceration, Psychology staff will request the inmate to complete a BP-A0171 Record of Information Release form to authorize the Bureau to obtain the inmate's prior mental health records from community providers who diagnosed or treated the inmate. Similarly, Health Services staff will request completion of a BP-A0621, Authorization for Release of Medical Information form, to obtain prior medical records relevant to the inmate's care. Signed documents will be added to the electronic health record. These signed documents will be added to the electronic health record and Psychology staff will enter as a *General Administrative Note*. If the inmate refuses to sign the records release form, this refusal will also be documented in the electronic health record as a *General Administrative Note*.

As appropriate, a diagnosis of GD will be made by a mental health clinician or primary care medical provider. The diagnosis will be added to the electronic health record. At a minimum, the inmate will be classified and maintained as a Mental Health Care Level 2.

If referral to medical or psychiatric staff is needed, the mental health clinician will complete an electronic referral to Health Services and document that request in the electronic health record as part of a *Clinical Contact or Consultation* note.

**Add.37**

b.  **Evaluation**

A diagnosis of GD can encompass a diverse array of conditions, with widely differing characteristics depending on the patient's age of onset, mental health, intelligence, environment, and motivation for identifying as the opposite sex. Like many DSM-V psychiatric conditions, GD is complex and often accompanied by other psychiatric comorbidities.

All inmates diagnosed with GD will be individually evaluated. Anxiety, depressive, personality, and posttraumatic stress disorders are mental health disorders that may coexist in those with GD. Because any co-occurring medical or psychiatric disorders may complicate the treatment of GD, a complete diagnostic and psychiatric/medical assessment of those with GD will be performed by Psychology Services clinicians and Health Services, respectively. Documentation of this evaluation will be entered into the electronic medical record.

Mental health clinicians or primary care medical providers will conduct a detailed clinical interview, and consider the use of the following instruments (as applicable) to evaluate the inmate:

- Clinical interview
- Beck Depression Inventory-II (BDI-II)
- Beck Anxiety Inventory (BAI)
- Wechsler Adult Intelligence Scale, 5th Edition
- Kaufman Brief Intelligence Test- 2nd Edition (KBIT-2)
- Montreal Cognitive Assessment (MoCA)
- Personality Assessment Inventory (PAI)
- Columbia Suicide Severity-Rating Scale Lifetime Recent (C-SSRS)
- Beck Scale for Suicidal Ideation (BSS)
- Posttraumatic Stress Disorder Checklist for DSM-5 (PCL-5)
- Utrecht Gender Dysphoria Scale- Gender Spectrum (UGDS-GS)
- If diagnosed with an autism spectrum disorder (ASD), the inmate may be additionally assessed with the Adaptive Behavior Assessment System 3rd edition (ABAS-3)

The evaluation and testing results will be documented in the electronic health records as *Psychological Testing* with results summarized in the *Diagnostic Care Level Formulation* note. Primary care medical providers may document their diagnosis and evaluation of additional medical concerns or treatment needs as a *Clinical Encounter* note.

5.  **TREATMENT**

Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 30, 2025), prohibits the Bureau from expending federal funds for "any medical procedure, treatment, or drug for the

**Add.38**

purpose of conforming an inmate's appearance to that of the opposite sex" "to the extent consistent with applicable law." *Id.* at 8,617-18. The Bureau will comply with this Executive Order unless compliance with the Executive Order is prohibited by a court injunction or court order. Though Executive Order 14,168 supports this policy, the Bureau also adopts this policy independently of Executive Order 14,168.

a.  **Individualized Treatment Plan**

If treatment for GD is likely to be necessary based on the results of the foregoing evaluation, the following treatment protocol should be followed:

All clinicians will review available documentation in combination with clinical interview(s) to determine the appropriate treatments addressing all identified medical and psychiatric concerns. Because treatment is individualized, treatment plans are tailored to the specific clinical needs of the inmate.

In general, identified medical and psychiatric comorbidities should be addressed before treatment for GD proceeds. As appropriate, medical and psychiatric comorbidities should be addressed through psychotherapy, psychotropic medication, or other appropriate medically accepted interventions. When comorbidities are addressed before GD, further treatment for GD may be necessary and may proceed once these medical and psychiatric comorbidities are resolved or ruled out as the potential cause of GD.

Psychotherapy should be prioritized. Treatment should include, at a minimum, therapy in accordance with their mental health care level as outlined in Program Statement PS 5310.16, **Treatment and Care of Inmates with Mental Illness**. Additionally, other treatments, such as psychoeducational group interventions, may be added as clinically indicated. Treatment interventions will focus on managing the psychological distress/dysphoria, assisting with adjustment to incarceration, community re-entry, and strengthening resilience. Follow-up mental health care should target any associated emotional or behavioral problems and should emphasize supportive treatment modalities.

All clinicians will ensure individuals with GD are not experiencing acute distress during any clinical contact. If the individual is experiencing suicidal ideation, a suicide risk assessment and appropriate protocols related to decreasing distress will be prioritized (in accordance with Program Statement PS 5324.08, **Suicide Prevention Program**). The psychologist may deem it appropriate to refer the individual for trauma treatment, if clinically indicated. Additional areas of focus may include adjustment to incarceration, other mental health diagnoses, community re-entry, and strengthening resilience. Follow-up mental health care should target any associated emotional or behavioral problems and should emphasize supportive treatment modalities.

Psychotropic medication should be considered to determine if its use may alleviate the symptoms of GD.

Diagnosis and treatment of GD will be discontinued if it is determined by a mental or medical health professional that the inmate no longer meets the criteria for the diagnosis based on clinical outcomes. The treatment plan will be updated, and a *Diagnostic Care Level Formulation* note will be entered into the electronic health record to reflect the diagnosis as "Resolved."

All clinicians shall ensure that individuals with GD receive informed care. The medical provider is responsible for ensuring that the inmate understands and signs the informed consent form, before any medication orders. Consent must be voluntary, and the inmate must be able to understand and appreciate the risks and potential side effects of the prescription. If the required documented evidence is insufficient, or if the inmate fails to sign the consent form, the clinician shall not prescribe medication or provide the procedure.

b.  **Availability of Sex Trait Modification Surgeries to Address Gender Dysphoria**

In instances when an inmate is diagnosed with GD, the Bureau will not provide sex trait modification surgeries to address GD and the inmate will not receive sex trait modification surgeries to address GD.

For inmates who have had sex trait modification surgery, medical care will be provided as necessary to address any complications or resulting conditions, such as urethral stricture and pelvic infections.

c.  **Availability of Hormones to Address Gender Dysphoria**

   i.  **Inmates Not Currently Receiving Hormones to Address Gender Dysphoria**

   In instances when an inmate is diagnosed with GD but is not currently receiving hormones to address GD, the Bureau will not provide hormones to address GD and the inmate will not receive hormones to address GD. Such inmates will continue to have an individualized treatment plan to meet the inmate's needs. The individualized treatment plan may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

   ii.  **Inmates Currently Receiving Hormones to Address Gender Dysphoria**

   In instances when an inmate is previously and currently diagnosed with GD and is currently receiving hormones to address GD, the MRT shall review and approve or disapprove the tapering plan submitted by the Primary Care Provider for all such inmates. Each tapering plan shall consider the appropriate factors, such as the duration the inmate

**Add.40**

has been receiving hormones to address GD, the initial rationale for receiving the hormone intervention, the response by the inmate to the intervention, and whether the inmate has undergone sex trait modification surgery.

For inmates that have recently begun receiving hormones to address GD, the Primary Care Provider shall develop a tapering plan that includes a rapid discontinuation of the hormone intervention.

For inmates that have been receiving hormones to address GD for an extended period of time, the Primary Care Provider shall develop a tapering plan that includes an appropriately paced discontinuation of the hormone intervention.

For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address GD for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones. But tapering plans should be reevaluated regularly with respect to cessation of hormones, including during the inmate's chronic care clinic appointments.

Medical and mental health professionals shall evaluate the inmate before beginning tapering. Based on that evaluation and patient-specific needs, medical and mental health professionals shall develop a monitoring and follow-up evaluation plan. All inmates who are tapering and were receiving mental health treatment before tapering shall continue to receive counseling and pharmacological treatment as appropriate as part of the inmate's individualized treatment plan. Tapering plans may be adjusted as necessary based on monitoring and follow-up evaluations, but the adjusted tapering plans must still be consistent with the purpose of this policy and based on all relevant factors, including security and prison-administration concerns.

Patients may submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process. All requests shall be considered in a reasonable amount of time in accordance with standard procedure, and decisions concerning such requests shall be based on all relevant factors, including security and prison-administration concerns.

### d. Social Accommodations

The Bureau will not provide social accommodations, including to inmates diagnosed with GD, and the inmate will not receive social accommodations. If the inmate currently has social accommodations, the Bureau shall no longer provide the social accommodations and, when practicable, remove or confiscate the social accommodations. When appropriate, and in accordance with standard procedure, inmates may still have access to purchase items on the standardized list of Commissary items available to inmates in their facility.

**Add.41**

## 6.  DOCUMENTATION AND TRACKING OF MEDICAL AND MENTAL HEALTH INFORMATION

Medical and mental health information for this population will be maintained in the current electronic recordkeeping system or health record system in accordance with PS 6090.04, **Health Information Management** and PS 5310.17, **Psychology Services Manual**. Medical and mental health information is considered confidential and may only be released in accordance with appropriate laws, rules, and regulations.

## 7.  ADMINISTRATIVE REMEDIES

Inmates who wish to seek formal review of any issue relating to this policy may use the procedures in PS 1330.18, **Administrative Remedy Program**.

## 8.  SEVERABILITY, APPLICATION OF THIS POLICY AND NO PRIVATE RIGHT OF ACTION

If any provision of this policy, or the application of any provision of this policy to any individual or circumstance, is held to be invalid, the remainder of this policy and the application of its provisions to any other individuals or circumstances shall not be affected. The intent of this policy is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law, including the Eighth Amendment to the U.S. Constitution.

Nothing in this policy shall prevent a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. The Bureau shall ensure that all inmates diagnosed with GD receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution.

Nothing in this policy is intended, nor shall it be construed, to create a private cause of action.

**Add.42**

## REFERENCES

*Program Statements*

| | |
|---|---|
| 1330.18 | Administrative Remedy Program (1/6/2014) |
| 5310.17 | Psychology Services Manual (8/25/2016) |
| 5310.16 | Treatment and Care of Inmates with Mental Illness (2/18/2025) |
| 5324.08 | Suicide Prevention Program (4/5/2007) |
| 6031.04 | Patient Care (3/14/2025) |
| 6090.04 | Health Information Management (3/2/2015) |

*Additional Resources for Clinicians*

Diagnostic and Statistical Manual of Mental Disorders (DSM), most current version.

***Performance-Based Standards and Expected Practices for Adult Correctional Institutions, 5th Edition:*** *5-ACI-1C-09, 5-ACI-1D-12, 5-ACI-1D-13, 5-ACI-2C-02, 5-ACI-1D-08, 5-ACI-3D-05, 5-ACI-3D-08(M), 5-ACI-3D-09, 5-ACI-3D-10, 5-ACI-3D-11, 5-ACI-3D-12, 5-ACI-3D-13, 5-ACI-3D-14, 5-ACI-3D-15, 5-ACI-3D-16, 5-ACI-6A-21(M), 5-ACI-6A-32(M), 5-ACI-6C-14(M).*

***Performance-Based Standards and Expected Practices for Adult Local Detention Facilities, 5th Edition:*** *5-ALDF-2A-27, 5-ALDF-2A-30, 5-ALDF-2A-32, 5-ALDF-6B-03, 5-ALDF-2C-03, 5-ALDF-4C-23M, 5-ALDF-4C-29M, 5-ALDF-4D-22, 5-ALDF-4D-23, 5-ALDF-4D-24, 5-ALDF-4D-25, 5-ALDF-4D-26, 5-ALDF-4D-27M, 5-ALDF-4D-28, 5-ALDF-4D-29, 5-ALDF-7B-08, 5-ALDF-7B-10, 5-ALDF-7B-11.*

*Records Retention*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

Add.43