# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

ALISHEA KINGDOM, et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the District of Columbia

———————————————

## PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY PENDING APPEAL

———————————————

Li Nowlin-Sohl
Leslie Cooper
Shana Knizhnik
James D. Esseks
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
lnowlin-sohl@aclu.org

Aditi Shah
Michael Perloff
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
202-457-0800
ashah@acludc.org
mperloff@acludc.org

lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

David C. Fathi
Maria V. Morris
Elisa C. Epstein
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

Corene T. Kendrick
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
202-393-4930
ckendrick@aclu.org

Shawn Thomas Meerkamper
Megan Z. F. Noor
Dale Melchert
TRANSGENDER LAW CENTER
PO Box 70976
Oakland, CA 94612
510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Lynly S. Egyes
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
510-587-9696
lynly@transgenderlawcenter.org

*Counsel for Plaintiffs-Appellees*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................. i

INTRODUCTION ......................................................................................1

STATEMENT............................................................................................2

    I.   BOP's Policy For Treating Gender Dysphoria Before The EO......................2

    II.  The EO And BOP's Implementation Of It Before This Lawsuit ....................4

    III. BOP's Program Statement And The Preliminary Injunction..........................6

STANDARD OF REVIEW ........................................................................10

ARGUMENT ...........................................................................................11

    I.   Defendants Are Not Substantially Likely To Succeed On The Merits..........11

       A.  The district court correctly concluded that the Program Statement
           likely is arbitrary and capricious. ..............................................................11

          1.  Defendants ignored relevant evidence in forming the Program
              Statement. ..................................................................................11

          2.  The Program Statement is implausible in light of the evidence...............13

          3.  The Program Statement is pretextual..........................................................16

       B.  The preliminary injunction is not impermissibly overbroad and does not
           does not violate the PLRA. ........................................................................16

    II.  Defendants Fail To Establish That They Will Be Irreparably Injured
        Absent a Stay. ............................................................................................19

    III. A Stay Would Irreparably Harm Plaintiffs And The Class And Is
        Contrary To The Public Interest..................................................................21

CONCLUSION ........................................................................................22

# INTRODUCTION

After full briefing and argument, including consideration of evidence submitted by both parties, on June 17, 2026, the district court entered a preliminary injunction prohibiting the Bureau of Prisons ("BOP") from enforcing a Program Statement that categorically bans gender-affirming health care—including hormone therapy and social accommodations—for people with gender dysphoria in BOP custody. The ban is mandated by an Executive Order ("EO"), and Defendants acknowledge that the Program Statement implements the EO. Mot. 1. A year before the Program Statement, BOP issued memoranda implementing the EO's ban, which the district court preliminarily enjoined on June 3, 2025, for lack of any reasonable explanation as required under the Administrative Procedure Act ("APA"). *Only after* the injunction did Defendants purportedly "study[] the question" and prepare an administrative record for the Program Statement imposing the same ban. Mot. 1-2.

The district court saw through Defendants' ruse: It concluded that Plaintiffs are likely to succeed on their claim that the Program Statement is arbitrary and capricious because Defendants failed to consider relevant evidence in forming the Program Statement, including BOP's own prior experience providing gender-affirming care to treat gender dysphoria for years before the EO, and because the Program Statement's ban on gender-affirming care is objectively unreasonable and Defendants likely engaged in reverse engineering to justify a result preordained by

1

the EO. Add.19-27. It also determined that Plaintiffs would suffer irreparable harm and that the equities and public interest weigh in Plaintiffs' favor. Add.27-32.

Defendants are unable to satisfy the stringent requirements of a stay. They fail to rebut the court's findings regarding the deficiencies in their purported explanation for the Program Statement. Their motion also independently fails because they do not show that without a stay they will suffer irreparable harm, "a necessary prerequisite for a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024). Defendants' effort to categorically ban gender-affirming care has been enjoined now for over a year, yet Defendants have not explained why they suddenly require the extraordinary relief of a stay to enforce their ban now, before this Court has had the benefit of full briefing and argument. Nor have they shown that a stay will not substantially injure Plaintiffs or that the public interest favors a stay. They accordingly fall far short of their burden.

## STATEMENT

### I.      BOP's Policy For Treating Gender Dysphoria Before The EO

Gender dysphoria is a serious medical condition "related to the incongruence between one's gender identity and attributes related to one's sex assigned at birth." Add.4-5. It is characterized by "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Add.5 (citation omitted). Absent effective treatment, people with gender dysphoria can experience depression,

2

anxiety, self-harm, and suicidality. *Id.*

For years, BOP provided gender-affirming care to treat gender dysphoria when clinically indicated. Add.9. This care helps alleviate the distress of gender dysphoria by helping people live consistently with their gender identity—including through hormone therapy to help align one's body with one's gender identity and social accommodations such as gender-appropriate clothing. *Id.* Plaintiffs submitted evidence below that gender-affirming care is effective in treating gender dysphoria, as shown by "decades of scientific research and clinical experience," "supported by all major American medical and mental health professional organizations," and "reflected in the clinical practice guidelines for the treatment of gender dysphoria that are regularly relied on by healthcare providers." Add.6. In 2017, BOP issued a formal policy that "called for individualized assessment for hormone therapy and other treatment … and also set forth the clothing and commissary policies applicable to transgender inmates," Add.9, and BOP provided gender-affirming care based on individual need before the formal policy as well.

Plaintiffs, who are diagnosed with gender dysphoria, have relied for years on medically-prescribed hormone therapy and social accommodations. Add.3. Plaintiff Kingdom received hormone therapy and had access to social accommodations while in BOP custody starting in 2016. First Kingdom Decl. (Dkt. 7-4) ¶¶ 8-9. Plaintiff Nichols was prescribed hormone therapy by BOP health care providers in 2021 and

had access to social accommodations starting in 2018. First Nichols Decl. (Dkt. 7-5) ¶¶ 6-7. Plaintiff Kapule received hormone therapy and had access to social accommodations while in BOP custody starting in 2022. First Kapule Decl. (Dkt. 7-6) ¶¶ 5, 7. Defendants do not dispute that Plaintiffs' hormone therapy was clinically indicated by BOP health care providers.

## II.     The EO And BOP's Implementation Of It Before This Lawsuit

On his first day back in office, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO"). As relevant here, it requires BOP to "revise[] its policies concerning medical care to be consistent with this order" and to "ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." EO § 4(c).

In short order, BOP began enforcing the EO's command. Kingdom was denied her hormone therapy, causing her "anxiety, panic attacks, thoughts of self-harm and suicidal ideation." Add.29-30. Nichols was given a lower hormone dose than his prescribed dosage and was told that his next dose would be even less, after which his treatment would be discontinued. First Nichols Decl. ¶¶ 14. When BOP later temporarily discontinued his treatment, he suffered "hot flashes, rapid mood swings, insomnia, and unreasonable sad[ness]." Add.30 (alteration in original) (cleaned up).

4

Kapule was told his hormone therapy would be discontinued when his prescription ran out. First Kapule Decl. ¶ 9. When BOP later temporarily discontinued his treatment, he suffered "depression, anxiety, and worsening gender dysphoria." Add.30. BOP also withheld social accommodations from Plaintiffs. Dkt. 67 at 4-6. Plaintiffs fear they will experience the same predictable harms if the Program Statement is enforced. Third Kingdom Decl. (Dkt. 179-6) ¶¶ 7-8; Third Nichols Decl. (Dkt. 179-7) ¶¶ 4-6; Third Kapule Decl. (Dkt. 179-8) ¶¶ 9-10.

BOP also issued memoranda implementing the EO. On February 21, 2025, it issued a memorandum prohibiting the use of appropriated funds to purchase social accommodations and requiring requests for clothing "that do not align with an inmate's biological sex" to be denied. Dkt. 1-1 at 3. On February 28, it issued a second memorandum providing that no BOP funds "are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." Dkt. 1-2 at 2. Defendants' only basis for the implementing memoranda was the EO. Dkt. 1-1; 1-2.

Plaintiffs initiated this case in March 2025, challenging the EO and BOP's implementation of it under the Eighth and Fifth Amendments to the Constitution, the APA, and the Rehabilitation Act of 1973. Dkt. 4-1 ¶¶ 96-137. They moved for class certification and a preliminary injunction. On June 3, 2025, the district court granted both motions, certifying a class of all persons who are or will be in the custody of

BOP facilities and are diagnosed with gender dysphoria and preliminarily enjoining Defendants from enforcing EO 14168 as applied to hormone therapy and social accommodations and BOP's implementing memoranda. Dkt. 68 at 1-2. The court concluded Plaintiffs were likely to succeed on their arbitrary-and-capricious claim because the implementing memoranda relied only on the EO and neither the memoranda nor the EO demonstrated reasoned decisionmaking. Dkt. 67 at 20-23. The court subsequently granted Plaintiffs' periodic motions to renew the preliminary injunction, which otherwise would have automatically expired in 90 days under the Prison Litigation Reform Act ("PLRA"). 18 U.S.C. § 3626(a)(2). *E.g.*, Dkt. 96.

Defendants did not appeal the preliminary injunction or any of the subsequent renewals until the district court's renewal order on May 26, 2026. Defendants filed an "emergency" motion to stay that order in this Court, which a divided panel granted on the ground that the order "appears to have been an administrative injunction." *Kingdom v. Trump*, No. 26-5181 (D.C. Cir. June 17, 2026) (per curiam) at 1. The majority noted that the order "raises unique concerns that will no longer present themselves after the [then-]pending motion [for an updated preliminary injunction] in the district court is resolved." *Id.* at 3.

### III. BOP's Program Statement And The Preliminary Injunction

On February 19, 2026, BOP issued Program Statement 5260.01, entitled "Management of Inmates with Gender Dysphoria." Dkt. 125; Add.34. The Program

Statement mirrors language used in the EO and implementing memoranda, stating that its intent "is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law." Add.42. Although BOP claims to "also adopt[] this policy independently of" the EO, the Program Statement acknowledges that it is supported by the EO and that BOP will comply with the EO absent a court order prohibiting compliance. Add.38-39.

Like the EO and implementing memoranda, the Program Statement prohibits hormone therapy and social accommodations to treat gender dysphoria. It categorically prohibits initiation of hormone therapy to treat gender dysphoria, stating that for people diagnosed with gender dysphoria not already receiving hormones, BOP "will not provide hormones to address [gender dysphoria]." Add.40. For people receiving hormone therapy to treat gender dysphoria, the policy requires they be tapered off—*i.e.*, cut off—hormones, mandating a "tapering plan" for "all such [individuals]." Add.40-41. For people who are "post sex trait modification surgery" or have been on hormones "for an extended period of time and develop severe physiological *and* psychological withdrawal effects from tapering," the policy states that it "may not be appropriate in *all cases* for the *initial* tapering plan to include *cessation* of hormones," but even those individuals' tapering plans "should be *reevaluated regularly with respect to cessation* of hormones." Add.41

(emphases added). In other words, the policy intends for everyone already receiving hormone therapy to treat gender dysphoria to be tapered off, although the timelines for doing so may differ.

The Program Statement also categorically bans social accommodations, stating that BOP "will not provide social accommodations" and individuals "will not receive social accommodations." Add.41. If someone currently has social accommodations, BOP will no longer provide them and will, "when practicable, remove or confiscate the social accommodations." *Id.*

On March 12, Defendants filed the certified index of the contents of their administrative record ("AR") for the Program Statement, which they described as "implemented by [BOP] to comply with [the EO]." Dkt. 151. Defendants produced the AR to Plaintiffs' counsel that same day. The AR consists of, *inter alia*, a summary document, a memorandum on the Program Statement, journal and news articles, studies, state correctional policies, clinical guidelines, and a declaration from Defendants' purported medical expert Dr. Kristopher Kaliebe, who was retained specifically for this litigation. *Id.* at 2-9; Add.7.

On April 29, Plaintiffs filed a supplemental complaint addressing the Program Statement and moved for an updated preliminary injunction. In support of their motion, Plaintiffs submitted declarations of their own and three expert declarations. The expert declarations included: (1) one from Dr. Dan Karasic, a psychiatrist with

8

more than 30 years of experience treating patients with gender dysphoria, explaining the evidence showing that gender-affirming care such as hormone therapy and social accommodations are effective treatments for gender dysphoria that are widely accepted in the medical community and can be medically necessary for some people, Add.5-6; (2) one from Dr. Ole-Petter Hamnvik, an endocrinologist explaining the "substantial evidence that hormone therapy for treatment of gender dysphoria is safe and presents risks comparable to the risks associated with other well-accepted medical treatments," Add.6; and (3) one from Dr. Cathy Thompson, BOP's former senior psychologist, explaining that "BOP's experience providing hormone therapy and social transition accommodations is at odds with the stated rationales for the Program Statement" and responding to purported security concerns raised by Defendants, Dkt. 179-4 §§ A, C. In opposition, Defendants filed excerpts of the AR and a declaration by Dr. Elizabete Stahl, BOP's Medical Director, that was not included in the AR. Dkt. 186-1–3. Plaintiffs submitted supplemental declarations from Drs. Karasic and Thompson to rebut Dr. Stahl's assertions. Dkt. 193-1; 193-2.

The district court granted Plaintiffs' motion on June 17, preliminarily enjoining Defendants from enforcing the Program Statement and requiring them to provide gender-affirming care in accordance with BOP policy prior to the EO. Add.1. The court determined Plaintiffs are likely to succeed on their APA arbitrary-and-capricious claim on three independent bases: (1) BOP did not properly consider its

9

own prior experience providing gender-affirming care, (2) the Program Statement is objectively unreasonable in light of the evidence before BOP; and (3) the Program Statement was reverse engineered to implement the EO. Add.19-27. It further concluded Plaintiffs would suffer irreparable harm without an injunction and that the public interest favors Plaintiffs. Add.27-32. The court did not reach Plaintiffs' Eighth Amendment claim.

On June 22, Defendants appealed and moved for a stay pending appeal in the district court, without making any argument as to the irreparable harm they would face without a stay. Dkt. 222. The district court denied Defendants' motion. Dkt. 228. On June 30, Defendants moved for a stay pending appeal in this Court. This Court should deny Defendants' motion for the reasons that follow.

**STANDARD OF REVIEW**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). "To obtain such exceptional relief, the stay applicant must (1) make a 'strong showing that [it] is likely to succeed on the merits'; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (alteration in original)

10

(quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The balance of equities and public interest merge in cases against the government. *Nken*, 556 U.S. at 435.

## ARGUMENT

**I.      Defendants Are Not Substantially Likely To Succeed On The Merits.**

**A. The district court correctly concluded that the Program Statement likely is arbitrary and capricious.**

1. *Defendants ignored relevant evidence in forming the Program Statement.*

Agency action is arbitrary and capricious when the agency "ignores relevant evidence." *Int'l Dark-Sky Ass'n, Inc. v. Fed. Commc'ns Comm'n*, 106 F.4th 1206, 1213 (D.C. Cir. 2024). In forming the Program Statement, Defendants ignored BOP's own prior experience providing gender-affirming care. As the district court observed, "[d]espite providing gender-affirming care to inmates in its custody for years, the government cites in the Program Statement *zero evidence* from its own medical or mental health professionals to support its conclusions," or any "evidence that gender-affirming care was ineffective or harmful to its own inmates diagnosed with gender dysphoria, or that providing this care previously led to security concerns at BOP facilities." Add.22 (emphasis added).

Defendants offer no persuasive evidence to dispute this finding. They argue the record "acknowledg[es] [BOP's] prior approach to treating gender dysphoria," Mot. 18, but simply referencing prior experience is not the same as actually

11

considering it. Defendants rely on a statement in Dr. Stahl's extra-record declaration that "[m]any of the BOP senior officials who wrote, consulted and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating the [Program Statement]." Stahl Decl. (Dkt. 186-3) ¶ 17. That assertion fails to show Defendants considered BOP's prior experience.

First, Dr. Stahl's statement sheds no light on relevant questions such as how gender-affirming care affected patients' health, whether it caused security problems, or if the referenced officials agreed with the prior policy or the Program Statement. *Id.* Second, Dr. Stahl disclaims any ability to assess the success of treatment provided under the prior policy, *id.* ¶ 16, effectively conceding that BOP "did *not* consider its own experience" with respect to the efficacy of gender-affirming care. Add.22.

Third, in any event, Dr. Stahl's declaration "cannot be credited" because the purported role of BOP officials who had experience with the prior policy does not appear in the AR at all: It is a "new reason[]" that expressly was offered to respond to Plaintiffs' point that BOP failed to consider its own experience. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020); Stahl Decl. ¶ 15. Defendants' reliance on *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454 (D.C. Cir. 2016), Mot. 18-19, fails because unlike the declaration in that case, the Stahl declaration *does* contain "new rationalizations" and is not "merely explanatory" of the AR. 819 F.3d at 464 (cleaned up). Allowing Defendants to rely on evidence that

appears nowhere in the AR and instead was offered after Plaintiffs "identified flaws in the original explanation" would "markedly undermine[]" values such as promoting agency accountability and ensuring "the orderly functioning of the process of review." *Regents of the Univ. of Calif.*, 591 U.S. at 23 (cleaned up).

There also is no merit to Defendants' specious argument that BOP cannot be forced to create evidence. The district court did no such thing. It instead faulted Defendants for ignoring evidence already in their possession, including not only the evidence underlying BOP's pre-EO policy, but also the evidence pertaining to Defendants' purported security concerns. Indeed, as the district court noted, "the government has not cited a single instance of gender-affirming care giving rise to safety concerns despite having provided such care for many years." Add.32. Defendants' ignorance of BOP's prior experience—which Defendants do not dispute is relevant—therefore renders the Program Statement arbitrary and capricious.

### 2. *The Program Statement is implausible in light of the evidence.*

The district court also correctly determined that the Program Statement likely is arbitrary and capricious because it "ban[s] evidence-backed care for an alternative that has no evidentiary support," making it an "implausible strategy to treat gender dysphoria." Add.25 (cleaned up). Agency action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants' decision to offer psychotherapy and psychotropic medications instead of gender-affirming care is implausible. BOP's own expert, Dr. Kaliebe, acknowledged psychotherapy as a treatment for gender dysphoria "is not evidence based." Add.24. BOP's Medical Director acknowledged psychotropic medications treat comorbidities, Stahl Decl. ¶ 6, not gender dysphoria itself. Add.29.

Defendants argue that their decision, despite the lack of evidence supporting psychotherapy, was based on "weak evidence for the efficacy" of gender-affirming care, "risks attending such interventions," and "prison-administration and security concerns." Mot. 11. But these assertions are unsupported by the AR. As explained in Dr. Karasic's declarations, which are in the AR, the evidence supporting gender-affirming care is of the same type the medical community routinely relies on when treating other conditions, and the risks are low, manageable, and comparable to those for "the same treatments when given to cisgender patients and in many other medical treatments." First Karasic Decl. (Dkt. 7-2) ¶¶ 74-75. Defendants' allegations of bias against certain organizations that support gender-affirming care are unfounded, as their guidelines were formed pursuant to a rigorous and evidence-based process. *Id.* ¶¶ 53-62. Regardless, such claims are immaterial, as there is no serious debate in the medical community about the necessity and efficacy of gender-affirming care to

treat gender dysphoria in adults, Second Karasic Decl. (Dkt. 56-3) ¶ 6, with major medical organizations continuing to endorse it, First Karasic Decl. ¶ 78.

The AR also identifies no security issues under the prior policy. Indeed, Dr. Thompson explained in a declaration included in the AR that gender-affirming care promoted prison safety by maintaining individuals' mental health and reducing crises. First Thompson Decl. (Dkt. 7-3) ¶¶ 44-45.

Defendants' purported explanation "runs counter to [all this] evidence before the agency." *State Farm*, 463 U.S. at 43. They contend that BOP saw this evidence and "simply disagreed with it." Mot. 16. But the law does not permit agencies to disregard evidence by "simply disagree[ing]" with it without a reasoned basis. Courts "do not … simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (citation omitted).

Nor is there any merit to Defendants' argument that the court erred by relying on materials outside the AR. Mot. 15. Evidence outside of the AR may be considered when, as here, the "agency action is not adequately explained in the record before the court," "the agency failed to consider factors which are relevant to its final decision," and "relief is at issue, especially at the preliminary injunction stage." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (citation omitted). As described above, Defendants ignored BOP's own experience providing gender-affirming care, and the

AR does not contain adequate explanation for replacing well-established treatments with the non-evidence-based option of psychotherapy alone. Moreover, the evidence *in the AR*—including the Karasic and Thompson declarations—suffices to show that the Program Statement does not follow from the evidence that was before BOP.

### 3. *The Program Statement is pretextual.*

The district court also concluded that the Program Statement likely is arbitrary and capricious for the additional reason that the evidence shows it was preordained and reverse engineered to implement the EO. Add.25-27. Contrary to Defendants' misleading assertion, this was not the "crux" of the court's decision. Mot. 12. Defendants' hyperbolic responses to this determination amount to a straw man: The court did not fault Defendants for being influenced by the EO; it faulted Defendants for "disregard[ing] significant evidence in [their] possession to reach the EO's mandated result." Add.26. Defendants' arguments rely on mischaracterizations of the district court's decision and therefore are inapposite.

### B. The preliminary injunction is not impermissibly overbroad and does not violate the PLRA.

Defendants further contend that the preliminary injunction violates the PLRA because it is, in their view, overbroad. As a threshold matter, Defendants forfeited this argument by failing to make it below. *Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015); Dkt. 186; 222. In any event, Defendants' argument fails.

Unlike the PLRA provision governing permanent injunctions (18 U.S.C.

16

§ 3626(a)(1)), the provision governing preliminary injunctions (*id.* § 3626(a)(2)) does not require the court to make explicit findings. Nevertheless, the district court expressly concluded that the preliminary injunction accords with the PLRA because it is "narrowly drawn, extends no further than necessary to correct the harm that the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm." Add.2. The court found that the injunction "extends no further than necessary to correct the harm that requires this preliminary relief" because it (only) "prevents the application of the Program Statement." *Id.*

Defendants attack the adequacy of the district court's findings, citing *Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020). But *Hoffer* was construing § 3626(a)(1), which requires explicit findings, rather than § 3626(a)(2), which does not. Moreover, the Eleventh Circuit's atextual requirement of detailed findings is an outlier and has been rejected by other courts. *See*, *e.g.*, *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010).

Defendants also contend that the district court erred in enjoining the entire Program Statement rather than just those portions governing hormone therapy and social accommodations. The evidence before the court, however, concerned gender-affirming care at large, and the Program Statement as a whole fails arbitrary-and-capricious review. The court concluded after carefully dissecting the evidence that Plaintiffs "have demonstrated that gender affirming care is the only effective

17

treatment for gender dysphoria," whereas Defendants' own expert acknowledged there is no evidence that Defendants' preferred alternative—psychotherapy—can effectively treat gender dysphoria. Add.29. The court also determined that the entire Program Statement likely is arbitrary and capricious because it ignores BOP's prior experience providing gender-affirming care and is implausible and pretextual. *Supra* pp. 11-16. Thus, the entire Program Statement fails based on the evidence and its arbitrary-and-capricious nature. In addition, it is well settled that where, as here, a court finds a prison policy unlawful, the PLRA permits enjoining the policy in its entirety. *E.g.*, *Fields v. Smith*, 653 F.3d 550, 558-59 (7th Cir. 2011) (policy banning gender-affirming care); *Crawford v. Clarke*, 578 F.3d 39, 43-44 (1st Cir. 2009) (policy restricting religious practice).

Defendants' argument that the preliminary injunction is overbroad because not all class members may require gender-affirming care in fact challenges the class certification decision. But Defendants never appealed that decision, and their time to do so has long passed. Fed. R. Civ. P. 23(f). Regardless, their argument fails. Class members are injured based on their gender dysphoria diagnosis alone because the "categorical ban—which precludes medical professionals from prescribing a gender-affirming treatment plan based on an inmate's unique needs—puts all class members at risk of being denied medically necessary care." Add.31. The preliminary injunction "provide[s] relief to each member of the class," *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 360 (2011), because it allows everyone in BOP custody with gender dysphoria to be *considered* for gender-affirming care based on individualized medical need consistent with BOP's pre-EO policy; whether or not they ultimately receive it is irrelevant. *See J.D. v. Azar*, 925 F.3d 1291, 1315-16 (D.C. Cir. 2019). The remedy is "proportional to the scope of the violation" due to the categorical ban; it "extend[s] no further than necessary" because it does not require BOP to provide care to people who do not need it. *Brown v. Plata*, 563 U.S. 493, 531-33 (2011) (rejecting claim that injunctive relief was overbroad in violation of the PLRA).

In any event, Defendants' arguments do not support a stay. Even if this Court were to agree with Defendants, the appropriate course of action—as Defendants' own authority suggests—would be to remand after considering the appeal on the merits for the district court to make any PLRA-required findings. *Hoffer*, 973 F.3d at 1279; *see also Jensen v. Thornell*, 2026 WL 2043607, at *3 (9th Cir. June 5, 2026).

## II. Defendants Fail To Establish That They Will Be Irreparably Injured Absent a Stay.

"[A] showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC*, 119 F.4th at 64. The harm "must be both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). This Court recently denied the government's motion for a stay because the government "failed

to show how [it] will be irreparably injured absent a stay." *Beatty v. Trump*, 2026 WL 1970557, at *1 (D.C. Cir. July 8, 2026) (per curiam). It should do the same here.

To start, Defendants forfeited any claim to irreparable harm by failing to argue it in their stay motion below. *Zevallos*, 793 F.3d at 114; Dkt. 222. In any event, their argument is meritless. Their contention that the government "is irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the [g]overnment," Mot. 25 (citation omitted)—rests on the false premise that the court's decision was "improper." As explained above, *supra* pp. 11-19, it was not.

Moreover, Defendants suffer no injury by being required to continue to provide care that they have been for years while this case proceeds. Defendants make vague references to "administration and security concerns" and "unjustified risks" of gender-affirming care, Mot. 25, but they fail to "support th[ese] assertion[s] with any specific facts or evidence." *Beatty*, 2026 WL 1970557, at *1. *See also Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at *3 (D.C. Cir. Sept. 25, 2025) (per curiam) ("The government, like other litigants, may not simply assume that this court will leap to intervene on its behalf based on generalized assertions of injury.").

Nor are Defendants able to show that any alleged harm is "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins*, 787 F.3d at 555 (cleaned up). Defendants did not appeal the court's preliminary injunction issued over a year ago, and they offer nothing to

show why it is so urgent for them to deny gender-affirming care to Plaintiffs and class members *now* such that this Court must grant the extraordinary relief of a stay pending appeal. Having sat on the injunction for over a year, Defendants plainly fail to meet their burden of showing they will suffer irreparable harm absent a stay.

### III. A Stay Would Irreparably Harm Plaintiffs And The Class And Is Contrary To The Public Interest.

Conversely, a stay would cause imminent and serious irreparable harm to Plaintiffs and class members. Plaintiffs' uncontroverted testimony details the harms they suffered when BOP previously denied them hormone therapy, including "anxiety, panic attacks, thoughts of self-harm and suicidal ideation when hormone therapy was withdrawn," "hot flashes, rapid mood swings, insomnia, and unreasonable sad[ness]," and "depression, anxiety, and worsening gender dysphoria." Add.30 (alteration in original) (cleaned up).

Defendants do not dispute that Plaintiffs faced these harms before and would face the same or worse should their hormone therapy and access to social accommodations be discontinued. Nor do they dispute that BOP health care providers have determined that hormone therapy is clinically indicated for Plaintiffs. Instead, Defendants contend that BOP would "administer appropriate care" by replacing their hormone treatment and social accommodations with psychotherapy. Mot. 25. But as Defendants' own expert admits, that has not been shown to alleviate gender dysphoria. As the district court noted, "even if the government's tapering

process mitigates severe withdrawal symptoms, it will 'not prevent the predictable serious harms of denying hormone therapy to those who have a medical need for it.'" Add.30 (quoting Third Karasic Decl. (Dkt. 179-2) ¶ 19).

Defendants' contention that Plaintiffs have not demonstrated irreparable harm on a classwide basis is a red herring: The Program Statement would cause irreparable harm to the class because it imposes a *categorical* ban on hormone therapy and social accommodations without regard to individualized need for those interventions, putting all class members at risk of being denied care they need. Again, the preliminary injunction does not require Defendants to provide gender-affirming care to individuals who do not need it; it merely prevents Defendants from withholding clinically-indicated care on which individuals have in some cases relied for years for their health and well-being.

Defendants make no other arguments on the equities or public interest. Both decisively weigh in Plaintiffs' favor because, as the district court determined, Plaintiffs' "interests in receiving medically prescribed treatment outweighs the minimal cost to the government of continuing such treatment" during the pendency of this litigation. Add.32. Moreover, the public interest disfavors a stay, as it lies "in the government's adherence to the law." *Id*.

## CONCLUSION

This Court should deny Defendants' motion for a stay pending appeal.

22

Dated: July 20, 2026

Respectfully submitted,

Li Nowlin-Sohl
Leslie Cooper
Shana Knizhnik
James D. Esseks
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

/s/ Aditi Shah
Aditi Shah
Michael Perloff
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
202-457-0800
ashah@acludc.org
mperloff@acludc.org

David C. Fathi
Maria V. Morris
Elisa C. Epstein
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

Shawn Thomas Meerkamper
Megan Z. F. Noor
Dale Melchert
TRANSGENDER LAW CENTER
PO Box 70976
Oakland, CA 94612
510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Corene T. Kendrick
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
202-393-4930
ckendrick@aclu.org

Lynly S. Egyes
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
510-587-9696
lynly@transgenderlawcenter.org

*Counsel for Plaintiffs-Appellees*[1]

---

[1] Counsel wish to express their appreciation to ACLU paralegal Samantha Weaver

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 5,198 words of the foregoing brief, and that this complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

*/s/ Aditi Shah*
Aditi Shah

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

*/s/ Aditi Shah*
Aditi Shah

---

for her assistance in the preparation of this brief.